1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

10

SOUTHERN DISTRICT OF CALIFORNIA

11

12  JENNIFER MEDINA, an individual,      )   Civil No.08cv1252 AJB (RBB)
                                    )

13                  Plaintiff,    )
                                    )
14  v.                              )   ORDER GRANTING IN PART AND
                                    )   DENYING IN PART MOTIONS TO
   COUNTY OF SAN DIEGO, et al.,      )   DISMISS [Doc. Nos. 45, 46 AND 47]

15                                      )
                Defendants.   )
16  _____)

17       Before the Court are three motions to dismiss submitted by Defendants County of San Diego,

18  Officer Mark Ritchie, and Officer Karla Taft; Officer Defendant Leo Nava; and Defendants State of

19  California (by and through California Highway Patrol) and Officer Tim Fenton (collectively "Defen-

20  dants").  The Defendants move to dismiss Plaintiff's Second Amended Complaint ("SAC") for failure to

21  state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the

22  Court GRANTS IN PART AND DENIES IN PART Defendants County of San Diego, Ritchie, and

23  Taft's motion, [Doc. No. 45]; GRANTS IN PART AND DENIES IN PART Defendant Nava's motion

24  to dismiss, [Doc. No. 47]; DENIES Defendants Fenton's, [Doc. No. 46-2] and Nava's requests for

25  judicial notice, [Doc. No. 47-3]; and GRANTS Defendants State of California and Fenton's motion to

26  dismiss, [Doc. No. 46].

27  ///

28  ///

1

***<u>Background</u>***

***I.       Factual Background***

Plaintiff Jennifer Medina is the widow of Robert J. Medina ("the decedent"). This case involves the events that occurred on the evening of November 15, 2006, during which Decedent was shot and killed by Defendants following an extended slow speed police chase involving 18 officers and 13 patrol units.  The following facts are taken from the SAC.

The decedent was a 22-year old active duty Marine, who had recently returned from a tour in Iraq. The decedent was suffering from post traumatic stress syndrome. His then undiagnosed mental illness was creating turmoil in his family relationships and adversely impacting his ability to perform at this command.

Less than a month before this incident, the decedent was arrested outside of his home in the City of Vista. He had been washing his truck and playing music when sheriff deputies allegedly responded to a call of a suspicious person in the area. The deputies arrested the decedent for possessing a baton that was issued to him by the Marine Corps for use in the performance of his guard duty assignment.

On the evening of November 15, 2006, a marital argument arose between the decedent and the Plaintiff that continued intermittently throughout the evening. Around 1:00 a.m, the decedent informed his wife Jennifer that he was going out despite her protests not to leave.

At approximately 1:30 a.m, on November 16, 2006, on Highway I-5 near the City of Oceanside, CHP officers attempted to conduct a traffic stop of the decedent, because officers observed decedent driving slowly and weaving within his own lane. The decedent's noncompliance with this traffic stop for suspected driving under the influence, was the initial violation. Although the decedent started to yield to the CHP's attempted traffic stop, he did not stop and continued driving slowly forward and eventually existed I-5 in the City of Oceanside where a slow speed pursuit ensued.

Officers attempted to forcibly stop the decedent using spike strips and pursuit immobilization technique (PIT) maneuvers which proved unsuccessful. The decedent  returned to the freeway and headed south on I-5 traveling within the speed limit. As the pursuit left Oceanside, the CHP officers requested that an Oceanside canine unit remain in the pursuit. The decedent exited I-5 at Carlsbad and headed toward Highway 101 south. Several times during the pursuit, as it was nearing Leucadia, the

1  decedent almost came to a complete stop. The officers also slowed several times and positioned

2  themselves to effect an arrest, however, the decedent continued driving slowly forward. By the time the

3  pursuit entered the community of Leucadia, within the City of Encinitas, there were at least five patrol

4  cars pursuing the decedent.

5          Defendant, Deputy Sheriff RITCHIE,[1] deployed a spike strip near Leucadia Boulevard. It is

6  unclear whether or not Deputy RITCHIE made radio contact with pursuing officers prior to attempting

7  to deploy the spike strip. At the same time and location, CHP officers elected to perform another PIT

8  maneuver. The decedent swerved to avoid the spike strip and although Deputy RITCHIE did not believe

9  the decedent was swerving to hit him, pursuing officers allegedly did.  Two officers radioed in an

10 "assault with a deadly weapon" which heightened the threat alert to other law enforcement personnel

11 monitoring, participating and joining in the pursuit. This radio call caused other law enforcement

12 officers to believe the decedent was a dangerous threat.

13         Officers continued their pursuit south on Highway 101 toward Solana Beach. Deputy RITCHIE

14 passed the slow speed pursuit without activating lights or sirens and when he reached Cardiff, he

15 deployed another spike.  It is unclear whether this was communicated by Deputy RITCHIE to the other

16 officers involved in the pursuit. The deployed spike strip was not successful and resulted in another

17 officer radioing in an "assault with a deadly weapon" call when the decedent swerved around the spike

18 strip. The spike strip disable two CHP patrol vehicles.

19         Deputy RITCHIE once again entered the pursuit and sped passed it until he reached Lomas

20 Santa Fe in Solana Beach. At that point, he observed CHP Officers FENTON and Martin attempt

21 another PIT maneuver on the decedent's vehicle. Officer FENTON observed that the decedent's vehicle

22 had spun out. Officers FENTON and Martin made a u-turn and were right next to the decedent's vehicle.

23         The decedent proceeded to drive past them and Officer FENTON yelled to Martin, "Let's end

24 this. Let's end this." Officers FENTON and Martin executed another PIT maneuver, this time tempo-

25 rarily disabling the decedent's truck by forcing it into a dirt easement off the sidewalk.

26

27 _____

28          [1] Defendant Officers' names are capitalized. The names of Officers who are not parties to this
action, appear in lower case.

Defendant Deputy RITCHIE immediately maneuvered to contain the decedent, ramming the front end of the decedent's truck with such force that Deputy RITCHIE's air bag deployed. Deupty RITCHIE told another deputy that he was attempting to "PIT" the decedent in order to end the pursuit. Other officers closed in immediately and pinned in decedent's truck from the south. CHP officers FENTON and Martin pinned decedent's car in from the north. Officer FENTON observed the decedent's vehicle cornered by law enforcement vehicles.

By this time, over a dozen officers had converged on the scene and several officers and deputies had taken up positions around the decedent's truck and in close proximity to it. Deputy RITCHIE told homicide investigators that he immediately went to the passenger side of the decedent's truck with his gun drawn. Deputy RITCHIE stated that the passenger side window was partially down and he was able to make eye contact with the decedent and observe his hands on the steering wheel. Plaintiff alleges that Deputy RITCHIE had no belief that the decedent was armed and did not fear the decedent. Deputy RITCHIE ordered the decedent to turn off the vehicle and put his hands up.

The decedent did not follow Deputy RITCHIE's orders. Deputy RITCHIE fired his gun at the truck's rear tire which deflated. Deputy RITCHIE again aimed his gun at the decedent and ordered the decedent to obey his commands.  The decedent was still not complying. Deputy RITCHIE fired another round at the front tire. Deputy RITCHIE again aimed his gun at the decedent and continued to shout commands. Deputy RITCHIE fired a third shot. Although Deputy RITCHIE told the homicide investigators that he fired a third shot, he did not tell the investigators the target of his third shot and none of the investigators asked him to provide an explanation as to the third shot.

Meanwhile, CHP officers NAVA and Carson were responding to a traffic collision when they heard an "information only" broadcast of the pursuit. Once at the scene of the collision they were told they were no longer needed. Officers NAVA and Carson then decided, without being requested to assist, to drive toward the pursuit. After arriving in the vicinity of the pursuit they observed the PIT maneuver that disabled the decedent's truck and parked their patrol car on Highway 101.

Officer NAVA told homicide investigators that he exited his patrol car and after seeing Deputy RITCHIE ram his patrol car into the front bumper of the decedent's truck, he ran toward the truck and took a position behind and to the left of Deputy RITCHIE. Officer NAVA also reported to homicide

1  investigators that he took a line of fire position where he could view the decedent through the right side

2  passenger window.

3  CHP Officers FENTON and NAVA and SDSD Deputy RITCHIE reported to homicide

4  investigators that after being pinned in by the patrol cars, that the decedent turned the wheels of his

5  truck to the right toward Deputy RITCHIE and accelerated his vehicle toward Deputy RITCHIE.

6  Officer NAVA's patrol partner, officer Martin, corroborated Officer NAVA's account to the homicide

7  investigators. It was this event that purportedly justified the use of deadly force. Officer FENTON's

8  partner, officer MARTIN, reported that he had laid down on his seat to kick open his door right before

9  the gunfire began, and therefore heard, but did not see, the officers open fire on the decedent.

10  SDSD Deputy TAFT, reported to homicide investigators that she ran across the median of

11  Highway 101 toward the decedent's truck with her gun drawn because the officers running toward and

12  surrounding the truck were "about to take him out." At the time the four officers fired their weapons at

13  the decedent, collectively shooting over 37 rounds at him. The decedent was alive when he was pulled

14  from his truck and first aid was administered by the officers. The decedent died shortly after the

15  paramedics arrived at the scene.

16  **II.   *Procedural Background***

17  On December 10, 2007, Plaintiff filed a lawsuit against Defendants in state court asserting

18  federal civil rights claims and state tort claims.  Plaintiff later dismissed her federal claims.  On July 11,

19  2008, Plaintiff filed a complaint against Defendants in federal court asserting federal law claims. [Doc.

20  No. 1.]  The case was then before the Honorable John A. Houston.  Thereafter, Plaintiff dismissed her

21  state court action in its entirety and sought leave to file an amended complaint in this matter to add her

22  state law claims.  On May 14, 2009, Plaintiff filed a First Amended Complaint ("FAC") against

23  Defendants, alleging violations of 42 U.S.C. § 1983, wrongful death, assault and battery, negligence,

24  and violation of California Civil Code § 52.1.[2] [Doc. No. 20.]  On May 29, 2009, the Defendants filed

25  motions to dismiss. [Doc. Nos. 21, 22, 23.]  On March 16, 2010, Judge Houston dismissed Plaintiff's

26  state law claims. [Doc. No. 40.]  In addition, Judge Houston granted the motions to dismiss as to

27

28
---
[2] On February 23, 2010, the court granted the parties' joint motion and consolidated this action with the action filed by the decedent's parents, *Medina v. County of San Diego*, 08cv1395 JAH (RBB).

Defendants State of California and Officer FENTON; Defendants County of San Diego and Deputy TAFT and Officer NAVA, finding that "Plaintiff fails to set forth any factual allegations as to the remaining Defendants' intent when using lethal force, and fails to sufficiently allege the lethal force used was unnecessarily excessive in light of the fact she alleges the decedent's vehicle was in motion when the other officers shot at decedent." *Id*. at 7.  Judge Houston denied the motion to dismiss as to Deputy RITCHIE, because "[t]aking the factual allegations as true and making all reasonable inferences, Plaintiff's allegations that Defendant Ritchie's[] shooting of the decedent was unreasonably excessive under the circumstances and with intent to harm unrelated to a legitimate law enforcement objective is plausible." *Id*.  Judge Houston also denied Defendant County of San Diego's motion to dismiss Plaintiff's municipal federal civil rights violation claim, finding that "Defendants' contention that the County of San Diego cannot be held liable under section 1983 fails" because "[t]he Ninth Circuit has held the sheriff acts for the county and not the state when investigating crime." *Id*. at 8.

On April 30, 2010, Plaintiff filed a Second Amended Complaint ("SAC"). [Doc. No. 42.]  On May 28, 2010, the Defendants filed motions to dismiss. [Doc. Nos. 45, 46, 47.]  On July 5, 2010, Plaintiff filed a response in opposition to Defendants' motions to dismiss.  [Doc. No. 48.]  On July 12, 2010, the Defendants filed replies in response to Plaintiff's opposition.  [Doc. Nos. 49, 50, 51.]  On March 25, 2011, Plaintiff's case was transferred from Judge Houston to this Court. [Doc. No. 53.]

### ***LEGAL STANDARD***

### I.   ***Fed. R. Civ. P. 12(b)(6)***

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the pleadings, and allows a court to dismiss a complaint upon a finding that the plaintiff has failed to state a claim upon which relief may be granted.  *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).   The court may dismiss a complaint as a matter of law for: (1) "lack of cognizable legal theory," or (2) "insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of Cal*., 88 F.3d 780, 783 (9th Cir. 1996) (citation omitted).  However, a complaint survives a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

1       Notwithstanding this deference, the reviewing court need not accept "legal conclusions" as true.

2  *Ashcroft v. Iqbal*, -- U.S. -- , 129 S. Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009).  It is also improper for

3  the court to assume "the [plaintiff] can prove facts that [he or she] has not alleged." *Associated Gen.*

4  *Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).  On the other

5  hand, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then

6  determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1929.  The

7  court only reviews the contents of the complaint, accepting all factual allegations as true, and drawing

8  all reasonable inferences in favor of the nonmoving party.  *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th

9  Cir. 2009) (citations omitted).

10  **II.**    ***Leave to Amend***

11       FRCP 15(a) declares that the "court should freely give leave when justice so requires." Fed. R.

12  Civ. P. 15(a). If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject

13  of relief, he ought to be afforded an opportunity to test his claims on the merits. *Foman v. Davis*, 371

14  U.S. 178, 182 (1962). Although there is a general rule that parties are allowed to amend their pleadings,

15  it does not extend to cases in which any amendment would be an exercise in futility or where the

16  amended complaint would also be subject to dismissal. *Pisciotta v. Teledyne Industries, Inc.*, 91 F.3d

17  1326, 1331 (9th Cir. 1996); *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991). Dismissal without

18  leave to amend is proper if it is clear that the complaint could not be saved by amendment. *Eminence*

19  *Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam).

20  ***DISCUSSION***

21       In the SAC, Plaintiff alleges two causes of action against all Defendants pursuant to 42 U.S.C. §

22  1983: (1) a Fourth Amendment excessive force claim on the decedent's behalf, and (2) a Fourteenth

23  Amendment loss of companionship claim on Plaintiff's behalf.  Against Defendant County of San

24  Diego, Plaintiff alleges a municipal federal civil rights violation claim pursuant to 42 U.S.C. § 1983.

25  Defendants have moved to dismiss all claims for failure to state a claim pursuant to Federal Rule of

26  Civil Procedure 12(b)(6).  In addition, Defendant Nava argues he is entitled to qualified immunity.

27

28

***I. Fourth and Fourteenth Amendment Claims***

Plaintiff's first claim seeks relief under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment. Specifically, Plaintiff alleges Defendants "used unnecessary, unjustified excessive force in shooting and killing" the decedent. SAC ¶ 48. Plaintiff's second claim seeks relief under 42 U.S.C. § 1983 for a loss of companionship in violation of the Fourteenth Amendment. Plaintiff contends that "[t]he killing of [the decedent] without lawful justification constituted an arbitrary abuse of police power under color of state law, committed with deliberate indifference to the rights of [the decedent's] family members." SAC ¶ 52.

To state a claim for excessive force, a plaintiff must establish that the defendant, acting under color of state law, violated his Fourth Amendment rights by using unreasonably excessive force during arrest. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). However, a plaintiff's Fourth Amendment rights are not violated if the use of force is "objectively reasonable" in that the force used was necessary "in light of the facts and circumstances confronting the officers," without regard to their intention and motivation. *Id*. at 397. To state a claim for loss of companionship in violation of the Fourth Amend-ment, a plaintiff must establish that the defendant's conduct "shocks the conscience." *See United States v. Salerno*, 481 U.S. 739, 746 (1987). Intent to inflict harm unrelated to a legitimate law enforcement objective "shocks the conscience" and gives rise to liability. *See Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008).

The Plaintiffs' FAC alleged that the decedent's truck was in motion while the Defendants shot at the decedent. Judge Houston granted Defendants' motions to dismiss (apart from Defendant Ritchie), because "Plaintiff fails to set forth any factual allegations as to the...Defendants' intent when using lethal force, and fails to sufficiently allege the lethal force was unnecessarily excessive in light of the fact she alleges the decedent's vehicle was in motion when the other officers shot at decedent."[3]  [Doc. No. 40 at 7.] In the SAC, Plaintiff attempts to cure the deficiency by alleging the decedent's vehicle was "pinned in, which made it impossible for the truck to turn its wheels and travel to the right toward the officers standing on the passenger side of the truck." SAC ¶ 39.

---

[3] In the FAC, Plaintiff alleged decedent "was able to finish pushing [Defendant Ritchie's] patrol car out of the way as he was being fired upon, and as his truck traveled forward, [Defendant] Fenton and [Defendant] Taft joined in the shooting melee." FAC ¶ 33.

Irrespective of the new allegation concerning a barrier preventing the truck from turning toward officers on its passenger-side, Plaintiff's SAC re-affirms that decedent's truck was moving when Officer FENTON fired his weapon. In offering conclusory, non-factual, statements concerning the trajectory of the bullets, the SAC also refers to the "movement of the truck" and the positions of the respective officers and deputies, thereby conceding the truck was moving when Officer FENTON fired his weapon. The SAC does not contain any allegations to suggest that Officer FENTON fired his weapon at Plaintiff while the truck was stationary. (SAC, ¶ 39.) Moreover, the SAC re-affirms that several officers and deputies were surrounding decedent's truck and in close proximity to it when decedent extricated the truck from its position. (SAC, ¶¶ 32, 39.)

Based on the foregoing, the Court GRANTS the Defendant's Motion to Dismiss as to Defendants County of San Diego and Karla Taft; Defendant Leo Nava; and Defendants State of California (by and through California Highway Patrol) and Officer Tim Fenton.  The Court DENIES without prejudice Defendant Nava's motion to dismiss on qualified immunity grounds.[4]  The Court DENIES Defendants Fenton's and Nava's requests for judicial notice as they are not necessary for the resolution of the current motions.

## II.    *Fourth and Fourteenth Amendment Claims: Defendant Ritchie*

Judge Houston dismissed Defendant Ritchie's Motion to Dismiss Plaintiff's FAC, finding plausible Plaintiff's allegations that Defendant Ritchie used excessive force in shooting the defendant, and acted with intent to harm unrelated to a legitimate law enforcement objective.[5]  [Doc. No. 40 at 7.] In Defendant Ritchie's Motion to Dismiss Plaintiff's SAC, Defendant Ritchie contends Plaintiff's SAC

_____

[4] Until there are allegations supporting a constitutional violation, there can be no determination as to whether Defendant Nava is entitled to qualified immunity.

[5] Specifically, Plaintiff alleged that during the police pursuit of the decedent, Defendant Ritchie, without ensuring radio communication with pursuing officers, placed himself in the direct path of the pursuit while deploying a spike strip and failed to take cover.  Then, Defendant Ritchie again deployed a spike strip without radio communication which resulted in another "assault with a deadly weapon" broadcast by other officers.  After the decedent's truck was temporarily disabled, Defendant Ritchie rammed the decedent's vehicle with his police car.  Ritchie then went to the passenger side of the decedent's vehicle with his gun drawn and ordered the decedent to turn off the vehicle and put his hands up.  Ritchie did not believe the decedent was armed and did not fear the decedent.  When the decedent failed to comply, Defendant Ritchie became angry and fired his gun at the vehicle's tires.  Defendant Ritchie then fired his gun at the decedent while the decedent's vehicle was pinned in by two patrol cars. FAC ¶¶ 25-33.

1    fails to state facts sufficient to state a Fourth or Fourteenth Amendment claim.  Specifically, Defendant

2    Ritchie argues that Plaintiff does not allege Defendant Ritchie shot and killed decedent and contends

3    that this failure is fatal to Plaintiff's Fourth and Fourteenth Amendment claims. [Doc. No. 45 at 3.]

4    Additionally, Defendant Ritchie contends that vehicle pursuit is not an element of either a Fourth or

5    Fourteenth Amendment claim. [Doc. No. 45 at 8.]  In her Opposition, Plaintiff argues that the fact that

6    Defendant Ritchie may not have fired the fatal bullet "does not absolve [him] from liability." [Doc. No.

7    48 at 4.]  In addition, Plaintiff argues that "[p]ursuant to a long line of civil cases, police officers have a

8    duty to intercede when their fellow officers violate the constitutional rights of a suspect or other

9    citizen."  *Id*. at 3 (quoting *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *vacated in*

10   *part on other grounds by Koon v. United States*, 518 U.S. 81 (1996)).

11          Plaintiff's allegations in the SAC as to Defendant Ritchie are essentially unchanged from the

12   allegations in the FAC.  Although Defendant Ritchie is correct in stating that Plaintiff does not contend

13   Defendant Ritchie shot and killed decedent, this is not a fatal defect.  Plaintiff's allegations in regards to

14   Defendant Ritchie encompass the Defendant's conduct up to the actual killing of the decedent, and

15   whether the Defendant's bullet killed the decedent is but one factor to be considered in reaching the

16   merits of Plaintiff's claims.  Taking Plaintiff's factual allegations as true and making all reasonable

17   inferences, Plaintiff's allegations that Defendant Ritchie's shooting of the decedent was unreasonably

18   excessive under the circumstances and with intent to harm unrelated to a legitimate law enforcement

19   purpose is plausible.[6]  Accordingly, the motion to dismiss Plaintiff's Fourth Amendment and Fourteenth

20   Amendment claims is DENIED as to Defendant Ritchie.

21   ***III.    Municipal Federal Civil Rights Violation Claim***

22          Plaintiff asserts a municipal federal civil rights claim against Defendant County of San Diego.

23   Plaintiff contends Defendant "knowingly and deliberately fostered, maintained and condoned a policy,

24   practice and custom or otherwise acted in a manner that was deliberately indifferent to the lives and

25   liberty of such persons such as decedent Medina."  SAC ¶ 56.  Plaintiff alleges a failure to train,

26   supervise, and discipline with respect to the constitutionally appropriate use of force, use of racial

27

28          [6] The Court does not consider Plaintiff's failure to intercede argument, as it was not alleged in
     the SAC.

1  profiling, and use of improper pursuit tactics.  Plaintiff's claim is based on the allegation that the San

2  Diego Sheriff's Department "has been accused of racial profiling of Hispanic males" and "the law

3  enforcement activity at issue has been the use of unjustified deadly force in the City of Vista."  SAC ¶

4  19.  Plaintiff also alleges Defendant ratified the officers' misconduct.

5       Defendant argues Plaintiff's allegations of racial profiling and the unjustified use of deadly force

6  in Vista are conclusory, and as such, are not entitled to an assumption of truth. [Doc. No. 45 at 11-12.]

7  Defendant also contends "the SAC fails to allege...a basic element of ratification; that is that an

8  authorized County policymaker knew of and approved of the subordinate's unlawful actions and the

9  basis for the subordinate's actions at the time the subordinate's action were occurring."  *Id*. (emphasis

10  removed).

11       Municipalities, their agents, and their supervisory personnel may be held liable for deprivations

12  of constitutional rights resulting from their formal policies or customs.  *Monell v. New York Dept. of*

13  *Social Servs.*, 436 U.S. 658, 691-93 (1978).  A widespread practice of inadequately training officers

14  could be considered a "policy or custom" for municipal civil rights claims if the inadequate training

15  program evidences deliberate indifference to a constitutional right, which was the moving cause of the

16  alleged constitutional violation.  *Canton v. Harris*, 489 U.S. 378, 389-91 (1989).

17       The Court finds Plaintiff fails to sufficiently allege a municipal civil rights violation.  Plaintiff

18  does not offer factual support for her allegations of the Defendant County of San Diego's failure to train,

19  supervise, and discipline its officers.[7]  Plaintiff's allegations of racial profiling and unjustified use of

20  deadly force are likewise unsupported by facts.  Plaintiff does not offer facts regarding the specific

21  allegations and circumstances of the alleged racial profiling and unjustified use of deadly force.[8]

22

23       [7] Plaintiff alleges "The [San Diego Sheriff's Department]. . .has likewise been accused of racial

24  profiling of Hispanic males.  In the case of the [San Diego Sheriff's Department], the law enforcement
   activity at issue has been the use of unjustified deadly force in the City of Vista where [the decedent]
   resided and was previously profiled.  Less than a month before he was shot and killed, [the decedent]

25  was arrested outside his Vista home.  He had been washing his truck and playing music when sheriff
   deputies allegedly responded to a call of a suspicious person in the area.  The deputies arrested [the

26  decedent] for possessing a baton that was issued to him by the Marine Corps for use in the performance
   of his guard duty assignment."  SAC  ¶¶ 19-20.

27

28       [8] It is unclear whether the incident recounted in paragraph 20 of the SAC, in which the decedent
   was arrested for possessing a baton, is intended to support Plaintiff's allegations of racial profiling or
   unjustified use of deadly force.

1  Additionally, Plaintiff does not offer factual support for her contention that Defendant County of San

2  Diego ratified the officers' alleged misconduct. Without factual support, Plaintiff's allegations of a

3  municipal civil rights violation are not sufficient to state a claim.  Accordingly, the motion to dismiss

4  Plaintiff's municipal civil rights claim is GRANTED without prejudice.

5  *__CONCLUSION__*

6          Based on the foregoing, the Court GRANTS IN PART AND DENIES IN PART Defendants

7  County of San Diego, Ritchie, and Taft's motion to dismiss, [Doc. No. 45]; GRANTS IN PART AND

8  DENIES IN PART Defendant Nava's motion to dismiss, [Doc. No. 47]; DENIES Defendants Fenton's

9  and Nava's requests for judicial notice [Doc. No. 47-3]; GRANTS Defendants State of California and

10  Fenton's motion to dismiss, [Doc. No. 46]; and DENIES Defendant Fenton's request for judicial notice

11  [Doc. No. 46-2].

12          IT IS SO ORDERED.

13  DATED:  March 26, 2012

14

15                                                  Hon. Anthony J. Battaglia

16                                                  U.S. District Judge

17

18

19

20

21

22

23

24

25

26

27

28