ANTON C. GERSCHLER, ESQ. csbn 098682
DENA M. ACOSTA, ESQ. csbn 169719
North County Law Firm
914-A North Coast Highway 101
Encinitas, CA 92024
Telephone: (760) 633-4060
Fax:          (760) 633-4066

Attorneys for Plaintiff Jennifer Medina

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER MEDINA, an individual,<br><br>          Plaintiff,<br><br>     v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>          Defendants.<br>_____<br>ARLENE SUSAN MEDINA an individual, ROBERT LEO MEDINA an individual,<br><br>          Plaintiffs,<br><br>     v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>          Defendants. | No. 08-CV-1252-AJB(RBB)<br>(Consolidated with 08-cv-1395-AJB(RBB))<br><br>PLAINTIFFS OPPOSITION TO DEFEDANTS' MOTIONS FOR SUMMARY JUDGMENT OR ALTERNATIVELY SUMMARY ADJUDICATION<br><br><br><br>Date:          August 25, 2014<br>Time:          10:30 a.m.<br>Courtroom:     4B<br>District Judge:  Cynthia A. Bashant<br>Magistrate Judge: Ruben H. Brooks<br><br>Trial Date:     None set |

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

 A. ATTEMPTED TRAFFIC STOP AND SLOW SPEED PURSUIT . . . . . . 3

 B. THE SHOOTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. DEFENDANTS ARE NOT ELIGIBLE FOR QUALIFIED IMMUNITY
UNDER THE PLAINTIFFS' VERSION OF DISPUTED FACTS . . . . . . . . . . . 5

 A. BALLISTIC EVIDENCE PROVES SHOTS FIRED WHILE
TRUCK CONTAINED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  1. Officers' Testimony Supports Plaintiffs' Expert's Opinion
That The Decedent Was Being Fired Upon While the
Truck Was Still In Containment . . . . . . . . . . . . . . . . . . . . . . . . . 6

  2. Defendants' "Scientific" Experts Disregard the Physical
Evidence in Order to Reach Their Contrary Opinions . . . . . . . . . . 7

 B. DEFENDANTS FACTUAL ACCOUNTS ARE NOT CREDIBLE
AND CONFLICT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

  a. Characterization of Speed and Safety of Pursuit . . . . . . . . . . 8
  b. No Officer/Deputy Corroborates Ritchie Being on the
Passenger Side of the Truck or Shooting Out Tires . . . . . . . 8
  c. Characterization of Truck's Movement and Force
is Inconsistent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  d. Description of Shooting Event is Inconsistent . . . . . . . . . . 9
  e. No Tactical Control Maintained at Scene . . . . . . . . . . . . . . 9

  1. Ritchie's Version of Events is Incredible . . . . . . . . . . . . . . . . . . 10

  2. Nava, Fenton and Taft's Version of Events Are Not Credible . . . . 10

# TABLE OF CONTENTS

IV.   LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.   SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT
       ON PLAINTIFF JENNIFER MEDINA'S FOURTH AMENDMENT
       CLAIM BECAUSE TRIABLE ISSUES OF FACT EXIST ON
       WHETHER THE DEFENDANTS' USE OF DEADLY FORCE
       WAS OBJECTIVELY REASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . 12

         1.   The Use of Force Constituted a Constitutional Violation . . . . . . . 12

         2.   The Law Governing the Use of Deadly Force Was
            Clearly Established . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.   NAVA AND FENTON HAD A DUTY TO INTERVENE TO
       PROTECT MEDINA NOT SHOOT HIM AND ARE LIABLE
       UNDER BOTH CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D.   DEFENDANTS ARE JOINTLY LIABLE . . . . . . . . . . . . . . . . . . . . . . . 18

    E.   FOURTEENTH AMENDMENT ANALYSIS . . . . . . . . . . . . . . . . . . . . 18

         1.   Deliberate Indifference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         2.   Purpose to Harm Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    F.   MONELL CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         1.   Deficient Policies Lead to Decedent's Death . . . . . . . . . . . . . . . 22

         2.   Ritchie Has Demonstrated a Propensity to Use
            Excessive Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

         3.   The Homicide Investigation is Conducted in a Manner to
            Shield County and Deputies From Liability . . . . . . . . . . . . . . . . 23

    G.   MOTION TO STRIKE TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

*Adams v. Speers*
    473 F.3d 989 (9th Cir. 2007) ......................................... 19

*Brosseau v. Haugen*
    543 U.S. 194 (2004) .............................................. 13

*Brower v. County of Inyo,*
    489 U.S. 593 (1989) ..............................................12

*Cordova v. Aragon,*
    569 F.3d 1183, (10th Cir. 2009) ..................................... 13

*County of Sacramento v. Lewis*
    523 U.S. 833 (1989) ............................................ 19, 20

*DeShaney v. Winnebago County Dep't of Soc. Servs.*
    489 U.S. 189  (1989). ............................................ 16

*Desorbo v. Hay*
    343 F.3d 172 (2nd Cir. 2003) ....................................... 25

*Drummond v. City of Anaheim*
    343 F.3d 1052  (9th Cir. 2003) ...................................... 15

*Feeman v. Arpaio*
    125 F.3d 723, 735 (9th Cir. 1997) ................................... 11

*Gradstaff v. City of Borger*
    767 F.2d 161(5th Cir. 1985) ............................. 2, 18, 21, 22, 24

*Graham v. Connor,*
    490 U.S. 386, 396 (1989) ........................................ 13, 25

*Harris v. Roderick*
    126 F.3d 1189 (9th Cir. 1997) ...................................... 16

# TABLE OF AUTHORITIES

*Hayes v. County of San Diego*
    638 F.3d 688 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hope v. Pelzer*
    536 U.S. 730, 741 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hopkins v. Andaya,*
    958 F.2d 88 (9th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Johnson v. Duffy*
    588 F.2d 740 (9th Cir.1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Koon v. United States*
    518 U.S. 81 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Moreland v. Las Vegas Metropolitan Police Dept.*
    159 F.3d 365 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*O'Bert Ex. Rel. Estate of O'Bert v. Vargo*
    331 F.3d 29 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Plumhoff v. Rickard*
    134 S.Ct. 2012 2020 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13,14

*Porter v. Osborn*
    546 F.3d 1131, 1137 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,19, 20

*Price v. Sery*
    513 F.3d 962 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Saucier v. Katz*
    533 U.S. 194 at 216 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

*Smith v. Cupp.*
    430 F.3d 766 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tennessee v. Garner*
    471 U.S. 1, 7 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13

*Ting v. United States*
    927 F.2d 1504, 1511 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Koon,*
    34 F.3d 1416 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Lanier*
    520 U.S. 259 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Reese*
    2 F.3d 870  (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wilkinson v. Torres*
    610 F.3d 546 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# I.
## INTRODUCTION

"Peace officers stand at the front of law and the ordering processes of society. They restrain the violator, protect the compliant, and represent constituted authority in the scenes of both peace and turbulence of community life. We depend heavily upon their skill and disposition. They deserve and require the understanding and support of judges as well as of all citizens. Where any officer fails--whether for lack of courage, judgment, integrity, or humaneness--all the community suffers. We suffer because vested authority has failed to prevent some harm or because authority has been sullied and abused. With any abuse of authority the entire ordering process is weakened. The public trusts the entire process less, and antagonism to all figures of authority rises. No one should be more alert to the cost of failure than responsible law enforcement officers and we who work in the courts. We must do what we can to avoid the failures, to prevent their reoccurrence, and--at all times--stay true to the requisites of honesty and accountability imposed upon all who are at once representative of the law and subject to it. *Gradstaff v. City of Borger*, 767 F.2d 161, 166-167 (5th Cir. 1985).

The stage for this tragedy had already been set by law enforcement: a routine traffic stop for suspected DUI driving ended in a hail of gunfire in a densely populated beach town adjacent to a public train station, restaurants and residential homes. The suspect and decedent was a U.S. Marine just back from a tour in Iraq. Irresponsible actions by law enforcement officers created the very emergency that they claim justify an unjustifiable use of deadly force. Rather than seek the truth concerning the conduct of the officers, the law enforcement agency investigated in a manner to give credence to the officers and deputies fictionalized and ignore the physical evidence that contradicted their account of events in order to shield them and the municipality from liability – some would call it tantamount to a cover-up.

A little over a year prior to the shooting death of the decedent, there was a community outcry over the back to back shooting deaths of young Hispanic males in Vista by Sheriff deputies. In fact, deputy Mark Ritchie, the principal shooter, was still under investigation for one of the most controversial killings at the time Robert Medina was shot and the ensuing homicide investigation.

Defendants seek to be immunized from their reckless deviation from acceptable law enforcement training and policies which created the law enforcement disaster that ultimately resulted in the decedent's needless death. Plaintiffs submit that their evidence supports a reasonable jury finding Defendants conduct warrants not immunity but rather punishment in the form of punitive damages.

## II.
## FACTUAL BACKGROUND

**A.    ATTEMPTED TRAFFIC STOP AND SLOW SPEED PURSUIT**

The Decedent Robert Medina had enlisted in the Marine Corps out of high school and was 22 years old at the time he was shot and killed. After returning from Iraq where he was a motor transport driver, he was stationed at Camp Pendleton and he and his wife Plaintiff Jennifer Medina had moved from Colorado to San Diego. They rented an apartment in Vista which was an affordable community close to Camp Pendleton. Shortly after returning from his tour in Iraq and only a couple months prior to the shooting, Robert had been confronted by deputies while washing his truck and when he asked why they were questioning him he was arrested for possessing a Marine Corps issued baton.

Robert had a difficult time adjusting to his life after he returned from Iraq. On the evening of the shooting, the young couple had a marital spat and he left to go for a drive as he often did when he was feeling troubled.      For reasons now known only to Robert, when a CHP unit attempted to pull him over, he did not stop on the freeway but instead exited into a residential neighborhood (unbeknownst to him it was a known gang territory to law enforcement) and began slowly circling the neighborhood. When the CHP unit that was following him suddenly rammed his vehicle he panicked. He called his wife Jennifer and told her he was scared and didn't know what to do.    (NOL #s 4,5,6)

Having heard the failure to yield on the radio, CHP officer Martin decided to respond as a back-up unit. Officer Martin was familiar with the neighborhood and its gang activity and was concerned that the failure to yield could in fact be a set-up for a police ambush by gang members.  (NOL #15 Depo Martin pp. 20-21, 24.)  In a doomed compounding of misperceptions, Martin's partner Defendant CHP officer Timothy Fenton would later irrationally heighten the perceived danger level of the pursuit to other law enforcement by broadcasting "245 - assault on an officer" calls over the radio when Robbie swerved spike strips that were being laid in his path. The path of travel of the pursuit and the identity of

1   the agencies and officers involved are not in dispute and set forth in great detail in the Plaintiffs'

2   consolidated complaint which is the operative pleading for purposes of this motion and in official

3   investigative records attached as Exhibits 3-7 to Plaintiff Notice of Lodgment of Evidence .

4   **B.     THE SHOOTING DEATH OF DECEDENT**

5          The pursuit lasted twenty-nine minutes from the time he failed to pull over until Robbie's truck

6   was disabled and pinned in front of the Solana Beach train station.  He was surrounded by deputies and

7   officers yelling commands that not even most of them found intelligible.  By the time shots were fired at

8   least eleven officers and deputies had arrived at the scene and were in close proximity to Robbie's truck.

9          None of the officers or deputies had concerns that Robert was armed because they could see into

10  the truck and saw that his hands were occupied on the steering wheel and gear shifter.  (NOL #10, 15:

11  Nava Depo, p. 151, 4-20; Martin Depo p. 42-43, l. 25-22.)   The officers and deputies also all knew that

12  the offense was a failure to yield to DUI traffic stop.   (NOL #s 4,6)   But they were also upset with the

13  decedent.  (NOL #9, 11: Ritchie Depo p. 260-261, Fenton Depo: 116, 120-121, 214.)  Fenton had been

14  on duty for over 10 hours before responding to the call and had been up for over 24 hours. (Fenton Depo

15  p. 176.)   Ritchie had rammed the truck so hard that his airbag had deployed and no doubt it hurt - alot.

16  (Ritchie Depo at Ex. 12.)

17

18         The deputies and officers surrounding the truck watched as Robert was trying to maneuver his

19  way out of containment between the patrol cars.  Robert's demeanor was described as calm and

20  determined as he trying to wedge his way out.  None of the officers stated that they gave, or heard any

21  other officer give, any warning to Decedent that deadly force would be used if he did not comply with

22  their commands. (NOL #9, p. 194-195.)

23

24         It is the extreme cross-fire that endangered so many law enforcement officers that is the most

25  obvious factor that defies the Defendants' alleged justification for shooting, i.e. to protect the safety of

26

27  primarily deputy Ritchie. Cross-fire traveled east to west and north to south endangering almost a dozen

28

1  officers on the scene – some who ducked and fell to the ground to avoid the shooters' cross-fire.   Forty

2  (40) rounds were fired by the four Defendants.  Approximately 37 rounds hit the truck hit the truck with

3  2 striking the decedent , 1 went into the front façade of a restaurant and 2 into a bedroom of a home

4  about a mile west of the train station.  No reasonable peace officer would shoot a suspect to save one

5  officer who placed himself in harm's way and risk killing or wounding a dozen other peace officers and

6  potentially citizens in a high density neighborhood.

7  

8       In an attempt to avoid duplication as much as is feasible, Plaintiff Jennifer Medina adopts and

9  incorporates the facts, evidence and legal arguments set forth in co-Plaintiffs' Memorandum of Points

10  and Authorities filed concurrently.  The Plaintiffs are jointly filing the evidence in support of their

11  respective oppositions.

12                                                     **III.**

13  **DEFENDANTS ARE NOT ELIGIBLE FOR QUALIFIED IMMUNITY**
   **UNDER THE PLAINTIFFS' VERSION OF DISPUTED FACTS**

14       Plaintiffs rely on the physical evidence which is reliable to prove their version of the shooting

15  event.  The factual accounts given by the law enforcement officers to justify the use of deadly force are

16  

17  refuted by the physical evidence.  The Defendants and their brethren deputy and officers claim the

18  decedent maneuvered his vehicle in such a manner that he placed one or more of the Defendants' safety

19  in jeopardy.  However, the ballistic evidence and the accident reconstruction measurement and analysis

20  performed by the CHP MAIT team disprove that their collective fiction is even possible let alone

21  probable.

22  **A.     BALLISTIC EVIDENCE PROVES SHOTS FIRED WHILE TRUCK CONTAINED**

23  

24       The Sheriff's Department having failed to perform its own complete and adequate scientific

25  analysis of the ballistic evidence to corroborate the Defendants account of events, the Plaintiffs hired

26  their own scientist.  Plaintiffs' ballistic expert Marc Firestone, Ph.D., performed a scientific analysis of

27  the ballistic and scene evidence including the measurements taken by the CHP MAIT team and

28

concluded that the physical evidence shows:

a.      Ritchie fired a total of 14 shots.  There was evidence of a bullet fragment and cartridge to substantiate Ritchie's claim that he shot the tires and if that is true then his first two shots were at the tires on the passenger side of the truck.  Ritchie then fired seven shots from in front of the truck from a distance of 10 feet before the truck had broken free traveling due west. He then moved south (away from the drivers side of the truck) firing another five shots. (Firestone Decl. ¶11; NOL #8: Depo p. 119, 135, 140, 175, 181, 208-209 and NOL #s 2-3)  Taft fired a total of 6 shots and was not in the path of the travel of the truck when it broke through the patrol cars and she began firing when it was in front of her and traveling past her.  (Firestone Decl. ¶13; NOL #s 2-3)

b.      Nava fired a total of 8 shots with his first three shots prior to the truck breaking free and from the passenger side of the truck, near the passenger window.  Otherwise, Nava would have had to outrun the truck. (NOL #8, FirestoneDepo. p. 188-190).  Nava was never in the path of the truck. (Firestone Decl. ¶12).  Fenton fired a total of 12 shots including into the rear of the truck after it had broken free from containment and his account of events of the location of Ritchie are inconsistent. (Firestone Decl. ¶14)

1.      **Officers' Testimony Supports Plaintiffs' Expert's Opinion That The Decedent Was Being Fired Upon While the Truck Was Still In Containment**

Officer Martin testified he heard a continuous volley of gunfire immediately after pinning the truck in from the north by placing his front grill push bar up against the passenger door of the truck while the truck was still on the sidewalk and pinned from the front by Ritchie's patrol car. (NOL #15: Martin Depo p. 62, 65, 67-68.)  Deputy Barrios was able to see officer Fenton firing while he was looking through the truck's driver's side window and then ducked and ran to avoid being shot by what he described as a continuous volley of gunfire. (NOL #13: Barrios Depo. p. 68-69, 82, 84-85.)

Officer Seabron heard gunfire "not even milliseconds after Medina's truck made contact with Ritchie's patrol car. (NOL #17: Seabron Depo. p 61-62, 77.)  Sergeant Mendoza told investigators that

he had seen the truck as he was pulling up and heard gunshots as he was getting out of his patrol car  and

that "*after the shots were fired*, that *his [decedent's] vehicle  traveled* in a westerly direction and it

coasted to a stop."  He described two volleys of shots.  (Mendoza Depo. p. 64.)

**2.    Defendants' "Scientific" Experts Disregard the Physical Evidence in Order
        To Reach Their Contrary Opinions**

The opinion of Mr. Phillips, the defendants' collective expert reconstructionist (employed by the

County), is based on Ritchie's story and disregards MAIT evidence of the scene in order to reach his

conclusion on the path of travel of the truck.  (NOL #1&3.)  Notably, according to Mr. Phillips evidence

was not collected from Ritchie's car that is relevant to the homicide investigation and his car was

subsequently destroyed.

Importantly, neither the defendants' ballistic expert or percipient firearms criminalists working

on the homicide investigation were requested to perform a complete reconstruction (like that performed

by Plaintiffs' expert) in order to determine the location and position of the shooting officers and

movement of the truck.  Yet the very purpose of a trajectory analysis is determine the location of the

shooters at the scene and in relation to the truck and which shooters fired which shots and although she

had enough information to perform a full trajectory analysis, she did not, and instead limited her

investigation to the defects in the truck. (NOL #19-22: Martini Depo, 23-24, 37, Mulligan Depo. 13-14,

35-37, 49-53, 56-57, 67;   Paul Depo, p. 34-37; Enyeart Depo p. 48, 51-53).

Ms. Mulligan testified she could not determine whether the shooters were moving and the truck

was stationary or whether the truck was moving forward or in reverse when the shots were fired.

(Mulligan Depo. 57-58, 63, 81-82.)   After conferring with lead Homicide Detective Enyeart, she

performed no analysis of the tires of the truck to rule in or rule Ritchie's account that he shot out the

tires because they determined that it would not have been the "best use of their time." (Mulligan Depo.

p. 50).

**B.     DEFENDANTS' FACTUAL ACCOUNTS ARE NOT CREDIBLE AND CONFLICT**

Inconsistent testimony of officers creates triable issue of fact. *Sallenger v. Oakes*, 473 F.3d 731 (7th Cir. 2007).   There were at least eleven officers at the scene at the time the shooting began.   At their depositions each deputy and officer reaffirmed the statements provided to homicide investigators without change.   The officers accounts conflict on material facts concerning: a) characterization of the pursuit, b) the location of the officers surrounding the decedent's truck, c) movement of the truck while it was pinned in by the patrol cars, d) when and how the truck broke free, e) when the shooting began and how many volleys were fired, f) tactical control of the scene, and g) decedent's demeanor.

    a.     **Characterization of Speed and Safety of Pursuit.**

OPD Sergeant Mendoza who was involved in the pursuit almost from its inception until the shooting characterized the pursuit as slow speed and safe in his interview with homicide detectives. Deputy Barrios also described the pursuit as safe (NOL #13: Barrios Depo, p. 5-18.)   Deputy Taft described the pursuit as slow speed (NOL #12: Taft Depo, p. 140, 156.).   Officer Martin did not see Medina driving erratically (NOL #15: Martin Depo p. 33.)   Neither deputy Ritchie nor deputy Barrios perceived Medina as trying to run down an officer, but instead as trying to evade capture. (NOL: #9, 13: Ritchie Depo, p. 143; Barrios Depo, p. 53.)   In contrast, officers and deputies described deputy Ritchie's pursuit tactics as unsafe. (NOL #16, 11: Mendoza, p. 118; Fenton, 113, 114).

    b)     **No Officer/Deputy Corroborates Ritchie Either Being on the Passenger Side of the Truck or Shooting Out Tires**

Deputy Ritchie's story is that immediately upon exiting his patrol car he went to the passenger side of the truck and took up a position outside the passenger door where he could see the decedent through the partially rolled down passenger side window and took time to deliberate on how to effect an arrest which included using a taser or baton and shooting out the back and front passenger side tires.

However, all of the officers claim they saw Deputy Ritchie directly in front of Medina's truck prior to the time it broke through the patrol cars.  Not one of the other ten officers at the scene, including

those arriving contemporaneously with Ritchie, who observed him exit his patrol car, corroborate his story that he went to or was ever on the passenger side of the truck or that he shot out the truck's tires to disable it. Rather they place Ritchie in front of the truck and to the left front area of his patrol car and never observed him on the passenger side of the truck nor did they see him shooting out tires. (NOL #s 11-15: Fenton Depo, pp. 132, 254; Taft Depo, p. 133; Carson Depo , 60, 101; Martin Depo, p. 59, 61.)

**c)     Characterization of Truck's Movement and Force is Inconsistent**

The officers' description of the trucks movement before it broke from containment varies widely. Some Deputies and Officers describe as a sudden forceful event involving only one or a couple impacts between the truck and Ritchie's patrol car. (NOL # 9, 10, 14: Ritchie Depo, p. 264; Nava Depo, p. 140; Carson Depo, p. 49, Martin, p. 63.)   Nava testified that as he was running up to the truck, the truck was completely stopped. (NOL #10: Nava Depo. p. 124).  Others describe the process as requiring time and deliberation.  Deputy Barrios estimated Medina's truck went backward and forward at least seven times. (NOL #13: Barrios Depo, p. 76) .  Deputy Taft described the number of times as "several" and that the truck was trying to "wedge" it's way out and she did not see the truck move the patrol car.  (NOL #12: Taft, p. 99, 128, 130, 133)  Others describe the movement as a "rocking back and forth.  Deputy Mendoza described the force as "pushing". (NOL #16, Mendoza Depo p. 48.)

**d)     Description of Shooting Event is Inconsistent**

As set forth in the Plaintiffs Robert and Arlene's Points and Authorities pages 3 through 11 and Plaintiffs' expert Marc Firestone summarized the Defendants' various accounts of the shooting in his Rule 26 report which is attached as an Exhibit to his Declaration.  The inconsistencies in the factual accounts between the deputies and officers are staggering.

**e)     No Tactical Control Maintained at the Scene**

Defendants tactical mistakes were serious and some expressly because they result as here in a fatality.  The Defendants created a dangerous situation by failing to follow their training and established policies to ensure safety for the suspect and officers.  (Clark Decl ¶5-11.)

### 1.    Ritchie's Version of Events is Incredible

If the other officers are to be believed, then Ritchie's version is a fiction.   At his deposition, Ritchie was unable to testify without referring to his interview statement given to investigators and brought a highlighted version of it to the deposition to testify from (despite having read it 20 times before the deposition.)  (NOL #9: Ritchie Depo Ex. 2)     Importantly, Ritchie has a propensity to use deadly force in a reckless manner. (RJN #s A-D.)

Ritchie described the subsequent events to investigators as follows: After pinning in the truck, he saw that it was stuck in the dirt and Decedent was trying to move the truck back and forth to get out. He immediately ran to the passenger side of the truck with his gun drawn in case the decedent tried to run. The truck's passenger window was partially down, and Ritchie made eye contact with the Decedent and began giving commands for Decedent to park the car and show his hand. Because the area was well lit, Ritchie could make out decedent's facial features, and he knew that Decedent heard his commands because they locked eyes.

Ritchie considered using his expandable baton to break the truck window in order to use pepper spray or taser, but decided it was too difficult to get out. Ritchie then decided to, and did, shoot out the right rear tire of the truck to keep it from getting traction.  This was allegedly his first shot.

Ritchie trained his gun back on Decedent, made eye contact with him, and began yelling loudly at Decedent to put the car in park and put his hands up. Ritchie then saw Decedent turning the steering wheel and became "increasingly impatient" and "frustrated" with his failure to comply with Ritchie's commands.

Ritchie fired a second shot at the truck's front right tire to prevent the truck from moving any further. While still outside the passenger door, he fired a third shot and pointed his gun back at Decedent. At that point, Ritchie describes the Decedent as backing up his truck and cutting the wheel at such a radius that the front end of the truck was pointing at Ritchie.

Ritchie states he watched as the right front fender and grill came at him and he deflected off of the truck and heard two rounds being fired from over his right shoulder. Then, he **"instinctively"** fired approximately eight rounds into the passenger compartment through either the windshield or passenger-side door or window.  (NOL #9: Ritchie Depo Ex. 2.)

## 2.   Nava, Fenton and Taft's Version of Events Are Not Credible

As set forth in Plaintiffs Arlene and Robert Medina's Points and Authorities at pages 11 to 14, their version of events are not credible and inconsistent.  Nava and Fenton deposition testimony was materially different on key facts from the account they gave investigators.  Nava at his deposition claimed the truck ran up and over Ritchie's patrol car to break through.  Fenton changed his story on how he exited his patrol car, what he heard and observed and the time he had to deliberate before shooting.  Taft's account that the truck was traveling directly at her is just plain contradicted the MAIT evidence which shows it traveling away from her not at her. (NOL #s 1, 9-12.)

### IV.

### LEGAL STANDARD

## A.   SUMMARY JUDGMENT STANDARD

"In considering a motion for summary judgment, the **court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the nonmoving party.**" *Feeman v. Arpaio* 125 F.3d 723, 735 (9th Cir. 1997).

In deadly force cases where the witness most likely to contradict the officer's story is dead, the court cannot simply accept what may be a self-serving account by the officer but must also consider circumstantial evidence that, if believed, would tend to discredit the officer, and consider whether this evidence could convince a rational jury that the officer acted unreasonably.  As the Court explained in *O'Bert Ex. Rel. Estate of O'Bert v. Vargo* 331 F.3d 29 (2nd Cir. 2003) *cert. denied*, 513 U.S. 820 (1994):

"…. given the difficult problem posed by a suit for the use of deadly force, in which "the witness most likely to contradict [the police officer's] story--the person shot dead--is unable to testify[,] …. the court may not simply accept what may be a self-serving account by the police officer…the court should "examine all the evidence to determine whether the officers' story is consistent with other known facts.., [citations omitted.]

Summary judgment in excessive force cases should be granted sparingly because the reasonableness of force used is ordinarily a question of fact for the jury. *Hayes v. County of San Diego*, 638 F.3d 688 (9th Cir. 2011).

**B.    DEFENDANTS' ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF JENNIFER MEDINA'S FOURTH AMENDMENT CLAIM BECAUSE TRIABLE ISSUES OF FACT EXIST ON WHETHER THE DEFENDANTS' USE OF DEADLY FORCE WAS OBJECTIVELY REASONABLE**

Plaintiff Jennifer Medina asserts that the defendants violated Robert Medina's Fourth Amendment right to be free from unreasonable seizure.  "In Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits." *Hopkins v. Andaya*, 958 F.2d 881, 885 n. 3 (9th Cir.1992).

**1.    The Use of Force Constituted a Constitutional Violation**

Plaintiff's excessive force claim is governed by the Fourth Amendment because "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  In addition, the Supreme Court has explained that a Fourth Amendment seizure occurs when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596-597 (1989). The intentional shooting at Plaintiff's decedent terminated his freedom of movement, and he was thus seized.

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness standard." *Plumhoff v. Rickard*, 134 S.Ct. 2012 2020 (2014). "[D]etermining the . reasonableness of a particular seizure . 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

government interests at stake.'" (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The Supreme Court also explained in *Brosseau v. Haugen* (2004) 543 U.S. 194, "it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11. But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id* at 197-198, citing *Tennessee v. Garner* (1985) 471 U.S. 1 (which also required a warning where feasible. *Id.* at 11-12). Additionally, "when there is objective reason to fear for one's **safety** ..., **but not one's life**, then force short of deadly force might be justified; to justify deadly force, an objective belief that an imminent threat of death or serious physical harm is required." *Price v. Sery*, 513 F.3d 962, 969 (9th Cir. 2008).

Defendants attempt to argue their motion under the rubric of "high speed chase" to bring this case within the fact scenarios faced by law enforcement in *Plumhoff* and *Brosseau* by selectively ignoring the actual facts of this case. The Supreme Court's decisions in *Plumhof* and *Brosseau* did not "declare open season on suspects fleeing in motor vehicles. "If that risk alone could justify shooting the suspect, every chase would end much more quickly with a swiftly fired bullet. *Cordova v. Aragon*, 569 F.3d 1183, (10th Cir. 2009).

Here, it was a safe slow speed pursuit arising from a failure to yield to an alleged traffic violation by an unarmed suspect who the officers did not believe was dangerous and at the conclusion of the pursuit the truck was contained when the shooting began. There was no justification for the use of deadly force. Given the multiple officers contradictory stories, their changing testimony, and their sworn statements that are starkly contradicted by physical evidence, circumstantial evidence and expert testimony, a reasonable jury could plausibly find that the shooting was precipitated by an angry deputy predisposed to use lethal force who lost control at the decedent's perceived defiance of authority which in turn triggered a *reflexive* not *protective* reaction in the other officers and that their false statements are

deliberate to avoid liability for an unjustified use of lethal force, as opposed to being the result of misperception or misrecollection.

In support of their claim of qualified immunity, at pages 12 – 15 of their Memorandum, Defendants Ritchie, Taft, Nava and Fenton cite eighteen federal cases where an appellate court found that the use of deadly force was justified.  In each and every case cited, the court held that the legitimate belief that fellow officers or bystanders were in danger from a fleeing suspect entitled the shooter to qualified immunity.  In every case, the victim of police shootings submitted no physical or other evidence whatsoever to contradict the policemen's claimed belief they were in immediate danger.  The Supreme Court's recent decision in *Plumhoff v. Rickard*, 134 S.Ct. 2012 2020 (2014) does not change the analysis, in *Plumhoff* there were videos from the patrol cars dash-cams to corroborate the officers' account of events.  Plaintiffs have provided the Court their own laundry list of similarly situated cases where qualified immunity was denied (see  co-Plaintiffs Points and Authorities at pp. 17-24).

Importantly, in none of the cases cited by defendants was any physical evidence offered to dispute the accounts of the officer witnesses that they feared for the safety of themselves or others, and thus none of the plaintiffs in those cases offered evidence which established a triable issue of fact.  That is not the situation in this case.  Here, the physical evidence at the scene and scientific analysis demonstrates that the decedent was being fired upon while the truck was still contained posing no danger or safety threat to the officers and deputies and that a physical barrier in the form of a cement light post prohibited any movement of the truck to the right in order to escape and then proceed directly at deputies Ritchie and Taft as they claim in order to justify their shooting.

Defendants submit declarations in which they state their subjective belief that they or other officers were in imminent danger from the acts of the decedent. (Ritche decl. at para. 7, Fenton decl. at para 17, Nava decl. at para. 15, Taft at para. 7)  Together, the four officers fired 40 rounds at Decedent's vehicle. They seek to justify this hail of gunfire by reciting the mantra that they 'feared for the safety of

1   other officers.'  It is obvious that no police officer wants to admit that he or she killed a suspect for no

2   good reason. It is equally obvious that the four shooting officers have tailored their testimony to make

3   their actions appear to be objectively reasonable. The officers' use of deadly force is not objectively

4   reasonable if a jury could reasonably determine that the officers were not in reasonable apprehension of

5   serious harm when they used deadly force. *Garner*, supra at 11.  Whether the officers in this case had

6   such a reasonable belief is a clear question of fact.

7

8          **What reasonable officer would shoot a suspect to save one officer from harm, who**

9   **intentionally placed himself in harm's way, and risk killing ten other officers at the scene?**  No

10  reasonable officer would jeopardize the lives of so many other officers at the scene.  That is precisely

11  why reasonableofficers at the scene did not shoot – protection of their fellow officers.  It is miraculous

12  and fortunate that none of the other officers and deputies were shot by Defendants during their hail of

13  gunfire.

14

15         Here, the officers and the deputies deviated from their pursuit and apprehension policies and the

16  end result was the death of the Decedent.  A police departments regulations are germane to the

17  reasonableness inquiry on in an excessive force claim because it could be difficult to conclude that the

18  officers acted reasonably if they performed an action that had been banned by their department or of

19  whose dangers they had been warned.  *Drummond v. City of Anaheim*, 343 F.3d 1052   (9th Cir. 2003)

20         2.      **The Law Governing the Use of Deadly Force Was Clearly Established**

21         There is no question that the general principle governing the use of force is clearly established:

22  deadly force is justified only if a reasonable officer in the officer's position would have had probable

23  cause to believe that there was a threat of serious physical harm to himself or others. *United States v.*

24  *Lanier* 520 U.S. 259, 271 (1997).  The Supreme Court has "expressly rejected a requirement that

25  previous cases be 'fundamentally similar' "in order for the law to be clearly established and has held

26  that "a general constitutional rule already identified in the decisional law may apply with obvious clarity

27

28

                                        - 15 -

to the specific conduct in question, even though the very action in question has not previously been held

unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

For example, in *Smith v. Cupp*. 430 F.3d 766 (6th Cir. 2005), the Court held that driving a stolen

police car did not by itself pose a grave enough danger to the public to justify shooting and denied the

defendant's motion for summary judgment and claim of qualified immunity holding that:

> Thus although events developed rapidly, under plaintiffs' version of the facts this is not a case
> where a dangerous situation evolved quickly to a safe one before the police officer had a chance
> to realize the change.... Instead, this is a case where a jury could conclude that Officer Dunn was
> not in any danger in the first place. The fact that this was a rapidly evolving situation does not,
> by itself, permit him to use deadly force. *Id* at 774-775.

The Plaintiffs' evidence described above establishes that there are triable issues of material fact

on the alleged 'objective reasonableness' of the shooting officers which preclude summary judgment.

**C.   NAVA AND FENTON HAD A DUTY TO INTERVENE TO PROTECT MEDINA NOT
       SHOOT HIM AND ARE LIABLE UNDER BOTH CLAIMS**

"We have explained the nature of the causation required in cases of this kind in *Johnson v.

Duffy*, 588 F.2d 740 (9th Cir.1978). There, we held that for purposes of § 1983 liability the requisite

causal chain can occur through the "setting in motion [of] a series of acts by others which the actor

knows or reasonably should know would cause others to inflict the constitutional injury." Id. at 743-44

*Harris v. Roderick* 126 F.3d 1189, at 1196 (9th Cir. 1997)

Plaintiffs assert that liability for their respective claims attaches to Officers Nava and Fenton

because they "had the ability to intercede and prevent [Deputy Ritchie's] use of force which is what

precipitated their own use.  The Supreme Court determined that officers do have a duty to intercede as

follows:

> when the State takes a person into custody and holds him there against his will, the
> Constitution imposes upon it a corresponding duty to assume some responsibility for his
> safety. . . . [An] affirmative duty to protect arises . . . from the limitation which [the state]
> has imposed on his freedom to act on his own behalf.

*United States v. Reese*, 2 F.3d 870, 887-88 (9th Cir. 1993) (citing *DeShaney v. Winnebago County Dep't*

*of Soc. Servs.* 489 U.S. 189, 199-200 (1989). A "special relationship" which includes a duty to protect arises when the state has taken the person into custody. *Id.* At 888; *Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991).

In the Rodney King case the Ninth Circuit acknowledged that "[p]ursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), vacated in part on other grounds by *Koon v. United States*, 518 U.S. 81 (1996). Citing to several out-of-circuit cases, the Ninth Circuit noted that:

> The constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows. Thus an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights.

Nava was aware this was a CHP pursuit and ran directly up to Ritchie in front of the truck and stood practically shoulder to shoulder with him. Instead of taking command he drew his weapon because Ritchie had his drawn. Both he and Ritchie were not following safe arrest protocol and both were yelling commands (that were not even intelligible to other deputies and officers at the scene). Although Ritchie's story is that he was the first to start firing his weapon (shooting out tires) after deliberation and Nava arrived contemporaneously but did nothing to protect the decedent and instead opened fire as well.

Fenton was instrumental in turning a safe slow speed pursuant into a calamity. He radioed in an "assault with a deadly weapon" twice during the pursuit while other deputies and officers perceived it as a benign attempt to avoid the spike strips. Fenton was agitated and encouraged more ill-advised PIT maneuvers telling his partner and driver Martin "Let's end this. Let's end this." He also failed to intercede at the scene when he had an opportunity to do so.

Telling of the fictionalized justification for shooting is the fact that after the shooting spree

1  stopped none of the officers or deputies who "feared for the safety" of Ritchie looked for him to see if he

2  was injured or killed as the allegedly feared.  (Fenton, p. 262-263).  Fenton testified that had he known

3  no one was under the truck, he would not have pulled the trigger (p. 289).

4  **D.     DEFENDANTS ARE JOINTLY LIABLE**

5      Defendants claim here as the officers did in *Granstaff v. City of Borger*, 767 F.2d 161 (5th Cir.

6  1985) that only the officer who fired the fatal bullet has culpability and if there is no conclusive finding

7  then there can be no constitutional deprivation by any officer.  As the Court summarily dispensed with

8  the argument explaining:

9

10         They may as well argue that no one on a firing squad is responsible for the victim's death
           unless we know whose bullet first struck the heart. The firestorm that killed James
11         Grandstaff was in all respects a joint operation: the same recklessness, the same
           circumstances, and the same object. Each participant was as much at fault as the others,
12         and all are liable for the foreseeable consequences. Each officer who fired his gun
           encouraged others to do the same. [citations omitted.]

13

14  **E.     FOURTEENTH AMENDMENT ANALYSIS**

15      Police conduct violates due process if it "shocks the conscience", *Porter v. Osborn* 546 F.3d

16  1131, 1137 (9th Cir. 2008) Conscience-shocking actions are those taken with either deliberate

17  indifference or a "purpose to harm… unrelated to legitimate law enforcement objectives". *Id*  The lower

18  "deliberate indifference" standard applies to circumstances where "actual deliberation is practical".

19
20  *Wilkinson v. Torres* 610 F.3d 546, 554 (9th Cir. 2010).

21      **1.     Deliberate Indifference Standard.**

22      Ritchie's version of events is that he had time to deliberate, considered other means of less lethal

23  force and took the time to shoot out the tires and pause and give commands and retrain his gun on

24  Medina in between shooting out the tires.  Only four officers approached vehicle, the other officers did

25  not attempt to approach the vehicle to remove Medina from his truck.  An inference can be drawn, as it

26  must in Plaintiffs' favor, that the other officers intended to await Medina's "decompression" so that they

27  could make an arrest without having to resort to force.  Their conduct supports Plaintiffs' assertion here

28

- 18 -

that they were no longer in a "tense, uncertain and rapidly evolving" situation.  Rather, since Medina's truck was not going anywhere, they had the opportunity to consider the potential consequences of their conduct," and had sufficient time in which to deliberate a course of action in order to effectuate Medina's arrest.  *Lewis*, 523 U.S. at 851, fn. 11 (by actual deliberation, we do not mean "deliberation in the narrow, technical sense in which it has sometimes been used in traditional homicide law…deliberation here does not mean that the man slayer must ponder over the killing for a long time, **rather it may exist and may be entertained while the man slayer is pressing the trigger of the pistol that fired the fatal shot,** even if it be only for a moment or instant of time).

Here, the officers at the scene, specifically Ritchie, had the time to deliberate and weigh the competing interests of their actions, e.g., the safety of both Medina and the officers in effecting an arrest after a period of de-escalation.

### 2.    Purpose to Harm Standard.

In 1998, the Supreme Court held that a police officer, who acts under circumstances where "actual deliberation is [not] practical," violates due process if he acts with a "purpose to cause harm unrelated to the legitimate object of arrest." *County of Sacramento v. Lewis* (1998) 523 U.S. 833, 836; *Moreland v. Las Vegas Metropolitan Police Dept.* 159 F.3d 365, 372 (9th Cir. 1998).

When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation.  His motives must then be assessed in light of the law enforcement objectives that can reasonably be found to have justified his actions. *Porter*, 546 F.3d at 1141.  In *Adams v. Speers* 473 F.3d 989 (9th Cir. 2007) the decedent led the officers on a chase, largely within the speed limit, for over an hour. The decedent refused to stop even after his car was rammed twice. *Id.* 991. Ultimately an officer shot and killed the driver without warning. *Id.* The Ninth Circuit determined that no officer could conclude under the circumstances that deadly force was appropriate, due to "[T]he absence of warning and the lack of danger to the shooter or others" rendered deadly force

unnecessary. *Id* at 993-94.

Here, Deputy Ritchie, like Officer Speers in *Adams* was an "officer off on a mission of his own creation." He interjected himself into the pursuit without requesting or receiving permission causing other officers to broadcast "assault on an officer" calls, he sped past the pursuit in violation of policy on the wrong side of the highway with no lights or sirens, he rammed the decedent's truck and allegedly shot out tires in violation of policy, and created a situation resulting in contagious (reactive) fire that resulted in the Decedent being shot to death.

Application of the "purpose to harm" standard also raises triable issues of fact whether the defendants intended to harm or kill Medina and thus acted beyond the scope of a legitimate law enforcement objective. It is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that shocks the conscience and gives rise to liability under §1983. *Porter*, 546 F.3d at 1140. Such conduct that is "beyond that which is required by a legitimate law enforcement objective, " is force against a suspect meant to "teach a lesson" or to "get even" even though such conduct might occur while effectuating an arrest. *Porter*, at 1141. Where an officer responds to an individual's unlawful conduct with an instinct to induce lawlessness, or to terrorize, cause harm, or to kill, then the element of arbitrary conduct shocking the conscience exists and an actionable violation of due process has occurred. *Lewis,* 523 U.S. at 853. Here, there was no "legitimate law enforcement objective" to warrant or justify the use of deadly force. None of the officers were in threat of any harm, let alone serious or deadly harm.

Along with an absence of legitimate law enforcement objective, strong inferences exist that the shooting occurred on account of Ritchies' frustration and anger. Medina was refusing to comply with Ritchie's orders to turn off his truck and submit to arrest. The inference can also be drawn that Ritchie fired because he was angry and frustrated because (1) he was involved in a chase; (2) his airbag deployed causing him pain (3) his patrol car was damaged; (3) he fired 14 rounds and (4) he was

1   predisposed to arrest a suspect at all costs – even if it meant deadly force.  Ritchie and the other officer's

2   self-serving accounts are post hoc transparent attempts to fabricate a legitimate law enforcement

3   rationale for their actions.  However, their version of events is patently contradicted by each other and

4   the physical evidence.

5   F.      MONELL CLAIM

6           The circumstances in this tragic case are unfortunately too similar to those encountered in the

7   fifth circuit in *Grandstaff v. City of Borger*  in which the Court upheld a finding of liability against the

8   City and further observed that the record revealed that the officers and police department's failure to

9   accept responsibility for their actions to avoid legal liability was despicable.  *Id.*164.

10          In *Grandstaff* the police mistook the decedent for a fugitive and killed him.  The police had

11  attempted to pull over a driver in a truck at 4:00 a.m. after he veered out of his lane.  When he refused to

12  stop, three patrol cars gave chase at high speeds and gunfire erupted.  The driver was wounded and he

13  turned off the highway and went through a fence onto a Ranch near a home where he then fled from the

14  truck.  Two more patrol cars arrived.   The foreman of the Ranch who lived at the house with his family

15  was awakened and drove to investigate and after reaching the patrol cars the officers opened fire on him

16  from two sides, when he managed to get out of his truck he was shot in the back with a high powered

17  rifle.  At the time of the firing there were five police cars in a line composing the entire night shift of the

18  force.  The officers and municipality denied liability throughout and the case went to trial where a jury

19  found in favor of the Plaintiffs.

20          The Court discussed that were a City has a policy or custom of dangerous recklessness which is

21  a "reckless disregard for human life and safety prevalent among the city's police officers which

22  threatens the life and security of those whom they  encounter, and if that recklessness is attributable to

23  the instruction or example or acceptance of or by, the city policymaker, the policy itself is a repudiation

24  of constitutional rights.  Where a police officer knows at the time they act that their use of deadly force

- 21 -

in conscious disregard of the rights and safety of innocent third parties will meet with the approval of

city policymakers, the affirmative link/moving force is satisfied." The Court adopted the rationale

expressed in another fifth circuit case:

> Conscious indifference to widespread incompetence or misbehavior may be more than a matter of extreme negligence and more than a failure to instruct or train. If it is the deliberate police policy to demand instant compliance, heedless of rights and risks, abuses--i.e., incompetence and misbehavior--will occur when officers of varying judgment and stability encounter resistance. If unconfined the policy ordains use of the ultimate compulsion, the firearm, upon any appearance of resistance and with only imagined justification. That policy employs armed officers who subject the public to the deprivation of their constitutional rights. Where the city policymaker knows or should know that the city's police officers are likely to shoot to kill without justification and without restraint, so as to endanger innocent third parties, the city should be liable when the inevitable occurs and the officers do so. *Id.* p. 170.

### 1. Deficient Policies Lead to Decedent's Death.

As a result of community outrage over the shooting deaths of four Hispanic males in four days

by Deputy Sheriffs in 2005, an independent audit of the Sheriff's Department was commissioned to

address the community's concerns. The Use of Force Audit was commenced in July 2006 and was

completed in June 2007 after the Decedent was killed. The Auditors reviewed the Department's policies

involving deadly force including those related to "fleeing" felons and "shooting at vehicles." The Audit

concluded that the Department's policies were deficient in several respects and specifically that the

shooting at vehicles policy was inadequate in its guidance to deputies and should be revised to address

tactical decisions as to the advisability and effectiveness of moving into the real or potential path of a

moving vehicle. The Department subsequently revised its policy to expressly prohibit shooting to

disable a vehicle. (RJN Ex B-C.)

### 2. Ritchie Has Demonstrated a Propensity to Use Excessive Force

Deputy Mark Ritchie has an extensive history of violence having been involved in three

shootings two of which ended in deaths and other less lethal but excessive force complaints while in the

performance of his duties. Despite being the subject of numerous complaints, having shot and killed two

young men in rapid succession, one of which he was subject to indictment for criminal charges for, he's

- 22 -

1  never been disciplined or even received retraining. (RJN Ex. A&E; NOL #9: Ritchie Depo p. 91.)   It is

2  ironic or perverse depending upon one's perspective that Ritchie's current duty assignment is the Vista

3  Courthouse as a training officer and one of his duties is providing legal updates to other officers.

4  (Ritchie Depo p. 91.)

5      Robert Medina was shot and killed on November 16, 2006 a little over a year after Ritchie shot

6  and killed Jorge Ramirez on July 29, 2005.   On June 21, 2007 (or April 12, 2007 as the rest of the

7  document is dated), the State of California's Department of Justice issued a public decision on it's

8  review of the San Diego District Attorney's decision not to prosecute Ritchie for the Ramirez killing.

9  And while the Attorney General's office ultimately found that the District Attorney's decision was not

10  an abuse of discretion, it also found that Ritchie's firing of six rounds into Ramirez' chest while he was

11  wounded and immobilized on his back or side was not an objectively unreasonable use of deadly force

12  and could not be justified as self-defense.  The State Attorney General concluded that Ritchie's actions

13  in shooting Ramirez in the chest was a "preemptive strike against the possibility of future harm, not to

14  defend against a perceived imminent attack." (RJN Ex A, p. 16.)

15      Here, as in the Ramirez case, Ritchie interjected himself into a situation creating a dangerous

16

17  situation which he created that lead to the use of deadly force.  Ritchie has a demonstrated propensity for

18  recklessness in the use of deadly force.

19

20  **3.    The Homicide Investigation is Conducted in a Manner to Shield the County and Deputies
       From Liability**

21

22      Because Ritchie was still being investigated and faced possible indictment for criminal charges

23  in the Ramirez case, one could conclude that the inadequacies and incompleteness of this homicide

24  investigation were by design rather than incompetence or neglect.  Although homicide investigators rely

25  on the crime lab to determine whether officer factual accounts are corroborated by the physical

26  evidence, the investigator did not request that the crime lab perform a complete analysis.  The crime lab

27  had had all the information it needed to perform a full reconstruction of the event in order to make a

28

1   determination concerning the position and location of the shooters and determine the timing and

2   sequencing of shooting (as Plaintiffs' expert did), but they did not. Conspicuously the crime lab did not

3   perform a scientific analysis of the tires in order to verify Ritchie's account of events of where he started

4   shooting from although his story was patently contradicted by the other officers. (Firestone Decl. ¶15;

5   (see section A.6 above.)

6
7        Nor did the homicide investigators delve into the inconsistencies between the officers accounts

8   and the physical evidence. Instead their interviews were suggestive and leading to the officers to

9   provide them the "justification" for their use of force and thereby exonerate them from liability for their

10  reckless conduct. (Clark Decl. ¶15;.) Not surprisingly, the Use of Force Auditors were also critical of

11  the Department's homicide investigation protocols finding the investigations were lacking completeness,

12  particularly as to deputy witnesses in shooting incidents. The Auditors also criticized the Department's

13  failure of its supervisor's to hold deputies accountable when policy violations or performance issues

14  influence shooting incidents.

15
16       It appears upon the facts of this case and the Ramirez case, that when the County wants to

17  exonerate a deputy as they did Ritchie in the Ramirez case, they will conduct a thorough investigation

18  (see trajectory and casing analysis attached as Exhibit D to the Attorney General's opinion at RJN Ex.

19  A), but when they want to shield a deputy, like Ritchie in this case, they narrowly tailor their

20  investigation to achieve their desired result. (RJN Exs A- C.)

21       In *Grandstaff*, the Court held that repeated acts of abuse on one night by multiple officers tended

22  to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom.

23
24  In this case we have several killings by deputies in a short period of time, and two by one deputy –

25  Ritchie.  The Court further found that the disposition of a policymaker may be inferred by his conduct

26  and that the fact that no reprimands or discharges or admissions of error following incompetent and

27  catastrophic performance could easily lead a fact finder to conclude that it was "accepted as the way

28

1    things are done and have been done in the City."   And "[i]f prior policy had been violated, we would

2    expect to see a different reaction." *Id.* p. 171.

3         Courts have held that the repeated use of force is sufficiently reprehensible to justify punitive

4    damages. *Desorbo v. Hay*, 343 F.3d 172 (2nd Cir. 2003).   There are triable issues of fact that preclude

5    summary judgment on the Plaintiffs' *Monell* claim.

6

7    **F.    MOTION TO STRIKE TESTIMONY**

8         Plaintiffs move to strike the Declaration of Dr. Getler and Defendants references to the decedent

9    Robert Medina's Death Investigation Toxicology Report because it has no bearing on what the deputies

10   or officers knew at the time they chose to use deadly force.  See page 10 of the County's Points and

11   Authorities that the Court's inquiry is to be based "upon the facts and information the involved deputy

12   possessed" at the time.

13

14                                              **V.**
                                          **CONCLUSION**

15

16        If an excessive force claim "turns on which of two conflicting stories best captures what

17   happened on the street", summary judgment is inappropriate. *Saucier v. Katz* 533 U.S. 194 at 216

18   (2001), citing *Graham v. Connor* 490 U.S. 386 (1988).   Plaintiffs have submitted their expert's

19   scientific ballistic analysis which establishes genuine issues of material fact and Defendants' motion

20   should be denied.

21   DATED: August 11, 2014

22

23                                              /S/ Dena M. Acosta
                                          Anton Gerschler, Esq.
24                                          Dena Acosta, Esq.
                                          Attorney for Plaintiff
25                                          Jennifer Medina

26

27

28

**CERTIFICATE OF SERVICE**

Case:    Jennifer Medina v. County     No.    08-CV-1252 AJB (RBB)
          of San Diego et al

I certify that on August 12, 2014, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**PLAINTIFFS OPPOSITION TO DEFENDANTS MOTIONS FOR SUMMARY JUDGMENT OR ALTERNATIVELY SUMMARY ADJUDICATION**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Michael P. Cayaban, Esq.
Office of Attorney General
mike.cayaban@doj.ca.gov
docketingsdawt@doj.ca.gov

Ricky R. Sanchez, Esq.
David Brodie, Esq.
Office of County Counsel
ricky.sanchez@sdcounty.ca.gov

Lee H. Roistacher, Esq.
Daley & Heft
lroistacher@daley-heft.com

Elaine Heine, Esq.
ElaineHeine@aol.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on August 12, 2014, at Encinitas, California.

/s/ Dena M. Acosta
Dena M. Acosa