# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER MEDINA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No. 08-cv-1252 BAS (RBB) (Consolidated with 08-cv-1395 BAS (RBB))<br><br>**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>**(ECFs 106, 107, 109)** |
| ARLENE SUSAN MEDINA, an individual; ROBERT LEO MEDINA, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | |

On July 11, 2008, Plaintiff Jennifer Medina brought this action against multiple municipalities and law enforcement officers, alleging violations of 24 U.S.C. § 1983 in connection with the fatal police shooting of her husband, Robert

Medina. Subsequently, this case was consolidated with the decedent's parents' Robert and Arlene Medina's action against the same defendants. ECF 35. On May 18, 2012, the plaintiffs filed a Consolidated Complaint. The defendants filed motions to dismiss, which were granted in part and denied in part. ECF 77. In that Order, the Court held the remaining defendants to answer, and they did so on April 2, 2013. ECFs 78–80.

Three § 1983 claims remain against Defendant officers Karla Taft[1], Mark Ritchie, Leo Nava, and Tim Fenton: one Fourth and one Fourteenth Amendment claim brought by Plaintiff Jennifer Medina on behalf of Robert Medina's estate and one Fourteenth Amendment claim brought by Medina's parents. Jennifer Medina's claim against the County of San Diego also survived the motions to dismiss.

Thirteen months later, three defendants' motions for summary judgment[2] were filed and are now pending in this case. ECFs 106, 107, 109. The individual defendants Nava, Fenton, and Ritchie assert they are entitled to summary judgment in their favor on the Fourteenth Amendment claims because there is no dispute of fact that their actions were not for a legitimate law enforcement purpose. Individual defendants Nava, Fenton, Ritchie, and Taft also argue they are entitled to summary judgment on the Fourth Amendment claims based on their qualified immunity. The County asserts there was no evidence of a systemic violation of constitutional rights invoking *Monell* liability. For the following reasons, summary judgment is **DENIED** on all three motions.

## FACTUAL BACKGROUND

This lawsuit, like many excessive force claims, arises from a fatal shooting witnessed only by law enforcement officer defendants and the decedent Robert

---

[1] Defendant Karla Taft was dismissed with prejudice from both Fourteenth Amendment claims. ECF 77. She remains a defendant only in Jennifer Medina's Fourth Amendment claim.

[2] Nava (ECF 106) and Fenton (ECF 107) filed independent motions for summary judgment; the County, Ritchie, and Taft filed a joint motion (ECF 109).

Medina. Because Medina is dead, only the officers may testify about the encounter. "In such a circumstance, we must carefully examine the evidence in the record to determine whether the officers' testimony is internally consistent and consistent with other known facts." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 791 (9th Cir. Mar. 31, 2014).

However, as in *Thompson v. Mercer*, 762 F.3d 433, 440 (5th. Cir. Aug. 7, 2014), the Court cannot accept the plaintiffs' preferred narrative as true if conflicting evidence conclusively shows the plaintiffs' version is inaccurate. *See id.* at 438 ("Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort"). In an effort to reconcile these two obligations, the Court has summarized the undisputed facts and construed reasonable findings in favor of the plaintiffs.

On summary judgment, the Court is not obligated "to scour the records in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). "[T]he district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).

**I. Facts[3]**

In the early morning of November 16, 2006, decedent Robert Medina was driving a blue Ram truck on Highway 78 in Oceanside, California. Gutierrez Decl. ¶ 3, ECF 106-2. Two California Highway Patrol ("CHP") officers in a patrol car

---

[3] In this case, the plaintiffs' statements of fact are woefully uncited. On this basis alone, the Court could find there are no genuine disputes of fact preventing the Court from ruling on summary judgment or qualified immunity as a matter of law. Instead, the Court did in fact scour the record to determine whether the plaintiffs' assertions were mere allegations or genuine factual disputes.

1 saw Medina's truck at about 1:23 a.m., weaving in his lane and traveling around 45
2 miles per hour. *Id.* at ¶¶ 3–4. Because the truck's driver appeared intoxicated, the
3 CHP officers attempted a traffic stop. *Id.* When Medina did not comply, the
4 officers radioed dispatch and informed them they were pursuing a suspect who
5 failed to yield. *Id.* at ¶ 4.

6 The officers followed Medina as he led them west on Highway 78 until it
7 met with Interstate 5, at which point he headed northbound. *Id.* at 5. The CHP
8 officer stated Medina generally traveled between 50 and 65 miles per hour on the
9 freeways. *Id.* Medina then exited the freeway in Oceanside, and the CHP officers
10 followed. *Id.* Because Medina continued to circle on surface streets and did not
11 stop for the police, the CHP officers attempted a Pursuit Immobilization Technique
12 ("PIT") maneuver. This entailed purposely running into the truck, causing it to spin
13 out. *Id.* at ¶ 7. However, Medina continued to attempt to evade the police, driving
14 through a chain-link fence and across an empty lot, then back onto surface streets.
15 *Id.*

16 Medina returned to Interstate 5 and headed south towards Carlsbad. He then
17 left the freeway again and drove west to Coast Highway, then proceeded south
18 towards Encinitas. *Id.* at ¶ 9. The officers observed Medina run red lights and
19 otherwise drive unsafely, although he did not appear to speed. *Id.* at ¶ 10.

20 At several points during the slow-speed pursuit, Medina stopped his truck
21 and then continued slowly. Ultimately, at least five patrol cars were in pursuit of
22 Medina.

23 Defendant Deputy San Diego County Sheriff Mark Ritchie deployed a spike
24 strip in front of Medina in the Leucadia community of Encinitas. Ritchie Depo.
25 107–108. Concurrently, the CHP officers once again PITed Medina, spinning him
26 again. Gutierrez Decl. ¶ 11. However, Ritchie failed to get the strip out in front of
27 Medina. Ritchie Depo. 107–108. Medina was able to swerve around the strip, then
28 regain control of his truck and continue south. *Id.*; Ritchie Depo. 107–108;

1 Gutierrez Decl. ¶ 11.

2     Ritchie, because he was deploying the spike strip, was outside his patrol car
3 when Medina swerved to avoid the spikes. Ritchie Depo. 105–107. Although
4 Ritchie did not believe Medina attempted to hit him (*id.*), Defendant CHP Officer
5 Tim Fenton radioed in to warn of an "assault with a deadly weapon" on a law
6 enforcement officer, leading other officers to believe Medina posed a dangerous
7 threat (Nava Decl. ¶ 6, ECF 109-3).

8     Ritchie passed the pursuit and parked on Lomas Santa Fe in Solana Beach.
9 Ritchie Decl. ¶ 5, ECF 109-4. He saw a CHP car perform another PIT maneuver on
10 Medina's truck. *Id.* at ¶ 6. CHP Officer Martin, Fenton's partner and driver, U-
11 turned so that they were right next to Medina's truck after it spun-out, but Medina
12 again drove past them. Fenton Depo. 117–119, ECF 117-9. It was at this point that
13 Fenton yelled to Martin, "Accelerate. Let's end this. Let's end this." *Id.* at 120;
14 Fenton Homicide Investigation Interview 9:2, ECF 117-9. Fenton and Martin again
15 PITed Medina, this time temporarily disabling his truck and forcing it into a dirt
16 easement past the sidewalk. Martin Depo. 54–55.

17     Ritchie rammed the front of his squad car into Medina's truck with enough
18 force that Ritchie's airbag deployed. Ritchie Decl. ¶ 6. Other police cars
19 surrounded Medina's truck, with Fenton and Martin pinning its passenger side
20 door and fender area from the north. Martin Depo. 65:1–8, ECF 106-15; Fenton
21 Decl. ¶¶14–15. Fenton saw that the truck was cornered by law enforcement
22 vehicles. Fenton Decl. ¶¶14–15.

23     At this point, over a dozen officers had converged on the crash and several
24 had taken positions around the truck. *Id.* Ritchie told homicide investigators he
25 immediate ran to the truck's passenger side. Ritchie Homicide Investigation
26 Interview 15:4–16, ECF 117-7. Ritchie stated the passenger window was partly
27 rolled down, that he made eye contact with Medina, and that he observed Medina's
28 hands on the steering wheel. *Id.* The plaintiffs claim Ritchie did not fear for his

1 safety and had no reason to believe Medina was armed.

2 Ritchie ordered Medina to turn off the vehicle and put up his hands, but Medina did not comply. *Id.* Ritchie then fired at the truck's rear right tire, deflating it. *Id.* He then reiterated his commands, training his gun on Medina. *Id.* When Medina kept his hands on the wheel, Ritchie shot out the front right tire. *Id.* At this point, Ritchie fired a third shot, but he did not tell the investigators where he aimed the third shot, nor did they ask. *See Id.*

Meanwhile, Defendant CHP Officer Leo Nava and CHP Officer Carson heard a broadcast about the Medina pursuit. Nava Decl. ¶ 6. They drove to the chase, heading north on Coast Highway, when they saw Medina's truck traveling south. *Id.* at ¶ 7. Nava made a U-turn to join the chase, and saw Medina's truck forced off the curb of the northbound lane of the highway, with the back of the truck against a fence. *Id.* at 9. After seeing Ritchie's car pin the truck against the fence, Nava stopped his car and approached the truck, positioning himself behind and to the left of Ritchie. *Id.* at ¶¶ 10–11. Nava drew his gun and shouted commands, looking at Medina through his front passenger window. *Id.* at ¶¶11–13.

Defendant San Diego County Sheriff's Deputy Karla Taft responded to a radio call about the chase and joined it on Coast Highway, near Leucadia. Taft Decl. ¶ 3, ECF 106-7. She was near the end of the pursuing cars at that time, heading south in Solana Beach, when Medina's truck was stopped. *Id.* at ¶ 6. She stopped her car and ran towards the truck, and she could hear yelling from the other officers toward the suspect. *Id.* at ¶ 7. She states she saw the truck moving back and forth, then pull away from the shoulder, appearing to run over Ritchie. *Id.* She states she feared the truck was headed towards her, and she fired on it as it passed within one to two feet of her. *Id.*

Fenton states that after an initial volley of gunfire, he opened fire on the truck. Fenton Decl. ¶ 17. He states he believed an officer had been run over and was attempting to protect the safety of the other officers nearby. *Id.* at 19. He fired

1 12 rounds of the course of approximately 5 seconds as Medina's truck traveled
2 across Coast Highway and over the center median. *Id.* at ¶¶17–20.
3       Nava and Taft reported that after Medina's truck was pinned in, Medina
4 turned his wheels to the right, towards Ritchie, and accelerated. Nava Decl. ¶ 14;
5 Taft Decl. ¶ 7. However, Ritchie also stated Medina turned the truck's wheels to
6 the left, away from him. Ritchie Depo. 376–77. Although Nava's partner, Officer
7 Martin, corroborated Nava's account, he did not see the shooting because he was
8 trying to free himself from his car. Martin Depo. 69:15–24. Defendants Taft, Nava,
9 Ritchie, and Fenton fired on Medina, collectively shooting more than 36 rounds at
10 the truck. Taft Homicide Investigation Interview 26:3 (5 rounds), ECF 117-10;
11 Ritchie Homicide Investigation Interview 16–17 (11 rounds); Nava Decl. ¶ 18 (8
12 rounds); Fenton Decl. ¶ 18 (firing 12 rounds). Medina's truck then rolled to a stop
13 in the southbound lanes of Coast Highway. Ritchie Homicide Investigation
14 Interview 17:28–29. When Medina was pulled from his truck, he was alive, but he
15 died shortly thereafter.
16       The defendants claimed that when Medina broke free of containment and
17 accelerated to the right, towards Nava and Ritchie, he created an imminent threat to
18 the officers necessitating deadly force.
19       The plaintiffs rely on Ritchie's potentially contradictory statement that
20 Medina had turned to his left to support the contention that the officers could not
21 reasonably believe Medina would hit Nava or Ritchie, even if he did break free.
22 They also posit that the danger created from discharging upwards of 40 rounds,
23 some of which lodged themselves in residences (Enyeart Depo. 55, ECF 117-2),
24 was an unreasonably dangerous response even if the truck did break free.
25       Lastly, the plaintiffs point to the County of San Diego's pattern of
26 complaints relating to police shootings and the resulting audit, in addition to
27 Ritchie's previous involvement in shootings to show that the County's conduct was
28 wrongful. This is the basis for Jennifer Medina's *Monell* claim.

1 **DISCUSSION**

2 **I. INDIVIDUAL LIABILITY**

3     **A. Qualified Immunity**

4 Qualified immunity protects government defendants "performing
5 discretionary functions ... from liability for civil damages insofar as their conduct
6 does not violate clearly established statutory or constitutional rights of which a
7 reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818
8 (1982). Entitlement to qualified immunity depends on a two-part analysis. First,
9 after resolving factual disputes in favor of the plaintiff, determining whether the
10 officer in question's conduct violated a constitutional or statutory right. *Luna v.*
11 *Mullenix*, 765 F.3d 531, 536 (5th Cir. Aug. 28, 2014). Second, the Court looks to
12 whether the right or statute violated was "clearly established" at the time of the
13 violation. *Id.* (quoting *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir.
14 2004). Qualified immunity takes into account the officer's knowledge at the time
15 of the incident, not information discovered later. *Id.* The Court must believe the
16 plaintiff's evidence, and "all justifiable inferences are to be drawn in his favor."
17 *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (internal quotations omitted).

18 The district court has discretion to determine whether there are "genuine"
19 factual disputes. *Luna*, 765 F.3d at 536, *See Reyes v. City of Richmond, Tex.*, 287
20 F.3d 349, 350 (5th Cir. 2002). If there are no genuine disputes of fact, or the fact
21 finder has made findings on the material disputed facts, the Court may grant or
22 deny qualified immunity as a matter of law. *See Luna*, 765 F.3d at 545 (King, J.,
23 dissenting) (citing *Jimenez v. Wood Cnty.*, 621 F.3d 372, 376 (5th Cir. 2010)),
24 *Campos v. Van Ness*, — F. Supp. 3d —, No. CA 09-11852-MLW, 2014 WL
25 5151109, at *3 (D. Mass. Sept. 29, 2014) (quoting *Iacobucci v. Boulter*, 193 F.3d
26 14, 23 (1st Cir. 1999)).

27

28

### 1. Clearly Established Law

To defeat a defendant's assertion of qualified immunity, plaintiffs must show that the defendant's actions violated a clearly established constitutional right. *Luna*, 765 F.3d at 543. "The contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The law at the time of the conduct must provide fair notice to the official that the conduct is unlawful. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

This Court "need not dwell on this issue. It has long been established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officers or others." *Lytle*, 560 F.3d at 417. Therefore the plaintiffs have satisfied this prong. The Court may then look to see whether the officer's actions constituted the violation of a constitutional right. If both prongs are satisfied, the Court cannot grant summary judgment predicated on qualified immunity.

### 2. Violation of a Constitutional Right

#### a) Fourth Amendment Violation

"An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. Mar. 31, 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1995) (internal quotations and emphasis omitted)). The Court uses an objective reasonableness standard, taking into consideration the totality of the circumstances, which can include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 793–94 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989). The immediacy of

the threat is the most important factor in this analysis. *Id.* at 794 (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).

The Ninth Circuit requires that officers warn suspects before using deadly force "whenever practicable." *Id.* (citing *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). If there are " 'alternative methods of capturing or subduing a suspect' available to the officers[,]" it is relevant to the reasonableness of the officers chosen course of action. *Id.* (quoting *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc)).

"The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985) (quoted by *Luna*, 765 F.3d at 537). "[T]he severity and immediacy of the threat of harm to officers or others are paramount to the reasonableness analysis." *Luna*, 765 F.3d at 537 (citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2021 (May 27, 2014). The Supreme Court, in *Plumhoff* and *Scott v. Harris*, found it reasonable to use deadly force to end a high-speed chase. *Plumhoff*, 134 S. Ct. at 2021–22; *Scott v. Harris*, 550 U.S. 372 (2007).

However, *Plumhoff* and similar cases do not establish a bright-line rule; "a suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is *per se* reasonable." *Luna*, 765 F.3d at 538 (quoting *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009)). Instead, *Plumhoff* is "simply [an] application[] of the Fourth Amendment's reasonableness requirement to particular facts." *Id.* (citing *Plumhoff*, 134 S. Ct. at 2020–22). "Nearly any suspect fleeing in a motor vehicle poses some threat of harm to the public. As the cases addressing this all-too-common scenario evince, the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable." *Id.* (quoting *Lytle*, 560 F.3d at 415); *see Scott v. Harris*, 550 U.S. at 380 (explaining that whether the driver "was driving in such fashion as to endanger human life" was a "factual issue").

In *Plumhoff*, the factual inquiry clearly shows that the driver posed an extreme threat to the officers and the public during the chase, such that it was reasonable to end the chase with deadly force. In *Plumhoff*, the chase "exceeded 100 miles per hour and lasted over five minutes. During that chase, [the driver] passed more than two dozen other vehicles, several of which were forced to alter course. [The driver's] *outrageously reckless* driving posed a grave public safety risk." *Plumhoff*, 134 S. Ct. at 2021 (emphasis added).

Similarly, in *Thompson v. Mercer*, 762 F.3d 433 (5th Cir. Aug. 7, 2014), the evidence showed an extreme recklessness necessitating deadly force.

> [P]arts of the police camera footage might be mistaken for a video game reel, with [the driver] disregarding every traffic law, passing other motorists on the left, on the right, on the shoulder, and on the median. He occasionally drove off the road altogether and used abrupt maneuvers to try to lose his pursuers. The truck was airborne at least twice, with [the driver] struggling to regain control of the vehicle. In short, [the driver] showed a shocking disregard for the welfare of passersby and of the pursuing law enforcement officers.

*Id.* at 438. Even so, the police in *Thompson* attempted to stop the chase at least four times with non-lethal methods "before resorting to deadly force to stop a driver who posed 'extreme danger to human life.' " Luna, 765 F.3d at 539 (quoting *Thompson*, 762 F.3d at 438, 440).

In contrast, if the danger is not sufficiently immediate or extreme, the use of deadly force is unreasonable even to end a high-speed chase. In *Luna*, the Fifth Circuit found deadly force unreasonable even though the fleeing driver sped at between 80 and 110 miles per hour and called 911 twice to claim he had a gun and would start shooting police officers if they continued their pursuit. *Luna*, 765 F.3d at 534. Even so, deadly force was unwarranted in that case to eliminate that safety threat because, after making reasonable inferences in the plaintiff's favor, there was not a "sufficiently immediate threat to justify deadly force." *Luna*, 765 F.3d at 540.

1    In these cases, the "core issue" is "whether the officer reasonably perceived
2  an immediate threat[,]" "focus[ing on] the act that led the officer to discharge his
3  weapon." *Luna*, 765 F.3d at 540 (quoting *Reyes v. Bridgwater*, 362 Fed.Appx. 403,
4  406–408 (5th Cir. 2010) (internal quotations omitted)). The Ninth Circuit counsels
5  that summary judgment in excessive force cases should only be granted
6  "sparingly[.]" *Gonzalez*, 747 F.3d at 795 (citing *Glenn v. Washington County*, 673
7  F.3d 864, 871 (9th Cir. 2011)). "This principle applies with particular force where
8  the only witness other than the officers was killed during the encounter." *Id.*

9    In this case, there is a genuine factual dispute about the dangerousness of
10 Medina's conduct. At the time of the attempted traffic stop, there were few cars or
11 pedestrians on the streets, and Medina did not exceed the speed limit or travel out
12 of his lane. Although he did drive off the road to avoid spike strips and after
13 various police cars rammed into his truck, he did not hit or attempt to hit any
14 officers outside of their cars. While his conduct was certainly dangerous, the facts
15 could reasonably show that it was not dangerous enough to justify deadly force.

16   Importantly, then, the Court must focus its attention on the act that led the
17 officers to shoot. At the time of the shooting, Medina's truck was pinned between a
18 fence and Ritchie's patrol car. Although Medina seemed to be attempting to escape
19 by rocking his truck back and forth, Ritchie and Nava could clearly see into the
20 passenger compartment and made eye contact with Medina. If Medina then broke
21 free and drove at Ritchie, as some of the officers claimed, deadly force might have
22 been justified. However, it is reasonable to infer that even if Medina did break free,
23 Ritchie could have avoided the danger by moving out of Medina's path.
24 Consequently, a less invasive solution could have been available.

25   Further, Ritchie's statements suggest Medina might have been turning to
26 avoid him. Ritchie stated he could see the tread of the front right tire, with the front
27 of the tire to the left and the back of the tire visible outside the tire well. As Ritchie
28 was standing on Medina's right, the jury could reasonably find that Medina was

not an immediate threat to run over Ritchie. In that case, because Nava was positioned near Ritchie and could see him, it could be unreasonable for Nava to use deadly force. *See Tubar v. Clift*, 453 F. Supp. 2d 1252, 1257 (W.D. Wash. 2006) *aff'd in part, dismissed in part*, 286 F. App'x 348 (9th Cir. 2008) (finding that once a car is no longer an immediate threat, deadly force is unreasonable).

Similarly, Taft's narrative may be internally inconsistent and show her actions were unreasonable. Taft claims Medina drove his truck straight towards her, and because of that she fired at it. However, she also states Medina drove past her, albeit within one or two feet. During this time, she was down on one knee and did not move out of the way. Taking inferences in the plaintiffs' favor, Taft's belief that Medina was about to hit her could have been unreasonable because he did not drive directly at her.

It is reasonable to infer from Fenton's statements that he unreasonably escalated the situation so that he could subjectively justify his desire to use deadly force. He makes no statements that Medina attempted to hit him with his car, although he does claim to believe Medina ran over an officer. However, Fenton previously radioed in the assault call, even though Ritchie states that Medina's actions did not constitute assault. Additionally, prior to the shooting and before Medina was stopped, Fenton expressed a desire to "end this." His statement could reasonably be construed as Fenton's decision to use deadly force, even before such force could reasonably be authorized. As such, Fenton's actions could have escalated the danger to create Fenton's desired deadly confrontation.

Independently, the number of rounds discharged may have posed an unreasonably excessive risk to both the officers themselves and any bystanders. A bullet was found in a nearby residence, and that alone could show that the escalation of force greatly exceeded a reasonable response to the situation. The dangerousness of the police conduct could be inferred to exceed the danger Medina

posed, and this inference itself supports a finding that the officers unreasonably violated Medina's constitutional rights.

Defendants Taft and Ritchie argue that their actions did not constitute a seizure, and therefore they are entitled to summary judgment in their favor. Def.s' Mot. Summ. J. 19:17–20:22, ECF 109. However, the hail of gunfire they participated in did effectively halt Medina, and as such they did effect a seizure. Further, making the plaintiffs' inference that all the defendant officers were shooting with the intent to kill, it follows that all members of such a firing squad are equally culpable. Thus, summary judgment cannot be granted in favor of those individual defendants simply because they did not fire the deadly bullet.

Ultimately, the facts of that chaotic night are currently in genuine dispute. With such disputes, it is difficult to construe a coherent narrative because it relies so heavily on compounding inferences leading to wildly diverging scenarios. It is for the fact finder to parse out the course of events of that night, and it cannot be properly determined at this stage. Because the plaintiffs may satisfy both prongs, the defendants are precluded from asserting qualified immunity. As such, this Court cannot grant summary judgment for any defendant on the basis of qualified immunity.

Accordingly, the individual defendants' motions for summary judgment on the Fourth Amendment violations are **DENIED**.

      b)  Fourteenth Amendment Violations

To establish a 42 U.S.C. § 1983 violation of substantive due process rights, the official action must "shock the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (2008). To meet this standard in an excessive force action, the plaintiff must show that the officer acted with a "purpose to harm" the decedent. *Id.*

Here, based on the reasonable version of facts most favorable to the plaintiffs, the officers might have acted with a purpose to harm. Fenton's announced decision to "end this" could suggest that the officers intended to harm

1 Medina beyond what was necessary to stop the chase. At that point in the chase, the facts could reasonably show that Medina's conduct was not sufficiently dangerous to warrant deadly force. Nava could clearly see Ritchie when he fired the deadly shot, and therefore could not reasonably believe Ritchie was imminently threatened. Fenton could have escalated the dangerousness of the encounter illegitimately.

Further, the sheer number of shots fired can support an inference that the officers' intention was not only to stop the chase, but also to harm Medina. As a result, the Court cannot grant summary judgment on the Fourteenth Amendment violations. Accordingly, the individual defendants' summary judgment motions on the Fourteenth Amendment claims are **DENIED**.

## II. The County of San Diego's Liability

The defendant County of San Diego argues that under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), it is entitled to summary judgment in its favor. Currently, the defendants have challenged Magistrate Judge Ruben Brooks' grant of the plaintiffs' motion to compel discovery relating to this issue. Because "it is customary and helpful for a district court to address pending discovery requests before granting summary judgment[,]" this Court **DENIES WITHOUT PREJUDICE** the County of San Diego's motion for summary judgment in its favor. *See McGary c. Culpepper*, 322 Fed.Appx. 509, 511 (9th Cir. 2009).

## CONCLUSION

For the foregoing reasons, the Court **DENIES** the defendants' summary judgment motions. ECFs 106, 107, 109.

**IT IS SO ORDERED.**

Dated: November 21, 2014

Hon. Cynthia Bashant
United States District Judge